MAE HALL v. STATE.

187 So. 392.
Opinion Filed March 14, 1939.

648

650

W. D. *Bell,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Tyrus A. Norwood,* Assistant Attorney General, for the State.

Brown, J.,—On February 2, 1933, three men were mysteriously murdered in Glades County, Florida. Lawrence Ford, alias Squash Ford, Bill Taylor, alias Gus Harris, Parker Mansfield and Finis Williams were indicted for the murder of these three men. In that trial Mae. Hall, defendant in the case at bar, testified that on the day of the killing of these men, Squash Ford, one of the persons charged with their murder, came to her place at Arcadia, armed with "a forty-five," in company with Robert Mickler, and bought eight or ten sandwiches, putting them in a paper bag "to take to the rest of the boys;" that Ford in her presence told her husband Obie Hall, that he (meaning Squash Ford) could "put anything on the spot with his forty-five;" that a few days before the killing, Ford stopped at her place and told her husband in her hearing that "there was some cow-stealing sons of bitches was going to be sorry of going in the woods." She further testified that a few days after the killing, she heard Ford tell her husband that he (Ford) was told to put them on the spot, and he surely could do it, and that there were three men killed and he helped kill them, and that he was not by. himself, but that there were two other men with him. A mistrial resulted in the first case.

Later the case was transferred to Sarasota County, and when the defendant, Mae Hall, was placed on the stand she repudiated all of her testimony given in the first trial. Thereupon, an information in two counts was filed against Mae Hall, charging her with perjury. The State abandoned the second count. The amended information was filed by the Honorable L. Grady Burton, State Attorney of the Tenth Judicial Circuit, who had been assigned by executive order to act as State's Attorney in the Twelfth Circuit.

The case came on for trial, and the defendant filed a challenge to the array of jurors on the ground that no

women were summoned on the jury; a motion to quash the information; a plea in abatement on the ground that State Attorney Burton had no authority to file the amended information, also alleging various other grounds, all of which were overruled by the Court. The defendant then announced by her counsel that she was ready for trial, and a trial was had. The jury convicted the defendant of perjury on the first count, and she was sentenced to life imprisonment, from which judgment and sentence she appeals to this Court by writ of error. While the sentence imposed is most unusual, it is within the limits fixed by the statute, section 7477 C. G. L.

The first question presented by plaintiff in error in her brief reads as follows:

"Is an information for perjury that does not show the materiality of the matter alleged to have been falsely sworn to sufficient to withstand a motion to quash?"

The amended information contained the following allegations:

"Whereupon, it then and there became and was a question material to the said issue, whether the said Lawrence E. Ford, alias Squash Ford, was guilty of the first degree murder of the said Donald Norton and to this material issue the said Mae Hall, being duly sworn as aforesaid to testify in the trial of the cause aforesaid . . . in the Circuit Court in and for Sarasota County, Florida, then and there on the 13th day of October, 1936, did wilfully, knowingly, feloniousy, falsely and corruptly testify to and before the Court and jury then and there trying said cause matters and things material to the issue therein in substance and effect as follows: * * * "

Then follows the material testimony which she is alleged to have testified falsely about. Then the information alleges:

" * * * all of which testimony was material matter to the issue being tried respecting which her said oath was taken."

The information, at the pleader's election, may either aver directly that the testimony falsely deposed was material to some issue on trial, or else allege facts from which its materiality will in law appear. Brown v. State, 47 Fla. 16, 36 So. 705; Tindall v. State, 99 Fla. 1132, 128 So. 494; Gibson v. State, 47 Fla. 34, 36 So. 706; Annotation in 80 A. L. R. 1443. We are of the opinion that, under this rule, the materiality of the false statements was sufficiently alleged.

The information was also attacked by motion to quash on the ground that it does not expressly and positively negative the truth of the alleged false statements. After the alleged false statements are set out, the information contains the following allegation:

" * * * whereas in truth and in fact the said Mae Hall then and there well knew that * * * " followed by a statement of what was alleged to be the actual facts. Thus the information expressly negatives the truth of each and every alleged false statement set out in the first part of the information. We hold that this is sufficient. The allegation that "Mae Hall then and there well knew" neither changes nor lessens the force and effect of the averment. State v. Loos, 145 Iowa 170, 123 N. W. 962. See also Wharton's Crim. Law, 12th Ed., pp. 1815, 1830; 57 Fla. 7, 49 So. 128, 17 Ann. Cas. 919; Note in 17 Ann. Cas. 921. As it may be of some assistance in future cases of this nature, the first count of this information is set out in full in a note at the end of this opinion.

The plaintiff in error then contends that the part of the information setting out the false testimony groups a number of different assignments in the same paragraph, each of which is a negative pregnant. This contention is with-

out merit. The information properly sets forth the false testimony as nearly as possible in the language of the accused. The matter alleged to be false and the matter alleged to be true are set out sufficiently and with such particularity as to inform the court and accused of the particular offense charged. 48 C. J., Perjury, Sec. 127, p. 877. All of the several particulars, in which the accused swore falsely, may be embraced in one count. Wharton's Criminal Law (12th ed.) Vol. 2, Secs. 1565 and 1567, pp. 1825 and 1826.

The information shows that it was sworn to by L. Grady Burton in the County of Hardee, which is in the Tenth Judicial Circuit; that it was filed on March 17, 1937, in the Circuit Court of Sarasota County, in the Twelfth Judicial Circuit; that thereafter it was again sworn to by Mr. Burton on March 22, 1937, before the Clerk of the Circuit Court of Sarasota County. The defendant contends that, because it wasn't sworn to at first in Sarasota County, it is void; also that when filed originally it had only been sworn to in a county outside the Twelfth Judicial Circuit.

The provision of the Constitution under which this information was filed is Section 10, Declaration of Rights, as amended, which provides:

"No person shall be tried for a capital crime unless on presentment or indictment by a grand jury, and no person shall be tried for other felony unless on presentment or indictment by a grand jury or upon information under oath filed by the prosecuting attorney of the Court wherein the information is filed."

This information, being sworn to both in Hardee County and in Sarasota County, and in each instance sworn to before a person qualified to administer an oath, in our opinion, meets the requirements of Section 10 of the Declaration of Rights. See Vann v. State, 131 Fla. 688, 179 So.

768, and Poole v. State, 129 Fla. 841, 177 So. 195, as being persuasive of the correctness of this holding.

Defendant contends that the executive order of the Governor did not give Mr. Burton any authority save to do and perform the matters and things necessary to be done and performed by the State Attorney in the *trial* of said cause: that the filing of an information was not included in nor contemplated by said executive order. The executive order, dated February 9, 1937, and filed in the Circuit Court for Sarasota County, on February 10, 1937, recited the disqualification of the resident State Attorney, and sent Mr. Burton to Sarasota.

"To officiate as State Attorney of the Twelfth Judicial Circuit of Florida, in and for Sarasota County, in the case of State of Florida versus Mae Hall, and to do and perform all matters and things necessary to be done and performed by the State Attorney of the Twelfth Judicial Circuit of Florida in the trial of said cause; * * * and he is hereby vested with all and singular the powers and prerogatives conferred by the Constitution and Laws' of Florida upon State Attorneys officiating by order of the Governor."

Under this order Mr. Burton, as assigned State Attorney, was authorized to do anything with reference to this case that the State Attorney of the Twelfth Circuit himself could have done if he had not been disqualified. Our holding is that the executive order was under the statute sufficient to authorize the assigned State Attorney to file this information against Mae Hall. The mere fact, if it was a fact, that the case of "State of Florida versus Mae Hall" was not actually pending on an information already filed at the time the executive order was issued, does not invalidate the order or defeat its evident purpose. The record is silent on this point. The information sworn to and filed by Mr. Burton, and upon which the defendant was tried, was en-

titled, "Amended Information." The briefs of plaintiff in error indicate that she was being "held" on a charge of perjury when Mr. Burton arrived in Sarasota. Just when the *original* information was filed is not shown by the record, but we deem this immaterial. The order evidently contemplated either that the prosecution was pending in some form, or that the case would be brought and an information filed by the assigned State Attorney, if necessary, and by fair implication authorized the assigned State Attorney so to do.

However, the defendant objected to the information in her motion to quash and plea in abatement on the further ground that the Governor had no constitutional authority to assign a State Attorney of another Circuit who would be vested with authority to file an information in the Circuit to which he was assigned. This question was raised, but not decided, in the case of Armstrong v. Stone, 130 Fla. 615, 178 So. 294. Nor are the cases of Sawyer v. State, 94 Fla. 60, 113 So. 726 and State v. Davidson, 121 Fla. 196, 163 So. 588, cited by plaintiff in error, strictly in point. The question is one of great importance, and not free from difficulty.

In considering this question, we should bear in mind that a state attorney in this State is not merely a prosecuting officer in the Circuit in which he is appointed; he is also an officer of the State in the general matter of the enforcement of the criminal law, subject to assignment by the Governor to any County in any Circuit of the State under Section 4743, Compiled General Laws. It is the State, and not the County, that pays his salary and official expense. He could never properly appear in the Circuit Court of some other Circuit in the State and defend a person charged with committing a crime in such other Circuit. While, under the Constitution, there must be "a state attorney in each judicial

circuit," the Constitution does not expressly or impliedly require the duties "prescribed by law" for such officer to be confined to the judicial Circuit in which he is appointed. Stone v. State, 71 Fla. 514, 71 So. 634.

Section 15, Article V, Constitution of Florida, provides that the duties of a state attorney "shall be prescribed by law." Section 10, Declaration of Rights, as amended, provides *inter alia*:

" * * * No person shall be tried for other felony unless on presentment or indictment by a grand jury or upon information under oath filed by the prosecuting attorney of the court wherein the information is filed."

Section 4743 C. G. L. of 1927, provides that the governor may "assign any State Attorney of the State to the discharge of the duties of State Attorney in any circuit of the State, at any regular or special term of the circuit court." The word "duty," when used in a statute, is not necessarily confined strictly to those duties which are expressly detailed in the statute," Stroud's Judicial Dictionary (2d ed.) p. 585, but it may be construed to cover those which are fairly or necessarily implied or necessarily incidental to the duty expressly imposed; and it has been construed to include a judicial discretion. State v. Clary, 25 Neb. 403, 41 N. W. 256, 257. It is commonly reserved as the designation of those obligations of performance, care, or observance which rest upon a person in an official or fiduciary capacity. Black's Law Dictionary, p. 402. Where an officer's duty and authority require the examination of evidence in the determination of questions of law and fact before taking action thereon, his duty and authority is ordinarily not strictly ministerial, but may even be quasi-judicial, or discretionary in its character. Stephens v. Jones, 24 S. D. 97, 123 N. W. 705, 708. We are therefore of the opinion that the filing of an information by an assigned State Attorney

may be included within the terms of Section 4743, C. G. L. of 1927, for under amended Section 10, Declaration of Rights, and under the above authorities it may become the positive duty of such assigned State Attorney, acting as "the prosecuting attorney of the court wherein the information is filed," after hearing and considering sworn testimony in a case involving a non-capital felony and satisfying himself that the evidence is sufficient to sustain a verdict of guilty of some criminal offense, to prepare and file an information charging the accused with the commission of such crime.

Section 4743 C. G. L. of 1927, was passed prior to the amendment of Section 10, Declaration of Rights. Defendant contends that it therefore pertains only to the duties of the State Attorney at the time Section 4743 was passed, and that the recent amendment of Section 10, Declaration of Rights, could not enlarge the scope of the statute. Could it be contended that any duties subsequently prescribed by the *legislature* could not be performed by an assigned State Attorney? We think not. The same principle would apply to duties subsequently imposed by constitutional amendment. Therefore, we hold that Section 4743 C. G. L. of 1927, was passed pursuant to the provision of the Constitution that the duties of a State Attorney shall be "prescribed by law," and that it is clearly applicable to any duties subsequently imposed upon State Attorneys by either statutory or organic law.

There were two kinds of criminal informations under the common law procedure in England, the first being for an offense considered as being against the king, the sovereign, and filed by an attorney general or solicitor general, without leave of court. The second was for offenses against private individuals and exhibited by the masters of the Crown. Joyce on Indictments (2d ed.) Sec. 8, p. 11.

Section 10, Declaration of Rights, in so far as the power to prefer and file an information is concerned, refers to the information of the common law of the class preferred in England by the attorney general or solicitor general. This authority in the United States, is usually vested in the State's prosecuting attorneys by statute or constitutional provision, if not indeed by virtue of their office, and may be filed without leave of court. 31 C. J., Indictments and Informations, Sec. 131, p. 625.

The undoubted benefits arising from the continued presence and functioning in each judicial circuit of some trained and responsible prosecuting officer representing the state, vested with the very grave but nceessary authority of initiating prosecutions by way of information, is no doubt the primary reason for the adoption of Section 10 of the Declaration of Rights. One of these benefits has been the reduction of the expense and the avoidance of the delay incurred in the frequent summoning of grand juries where prompt prosecutions for the commission of felonies is essential to the efficient administration of justice.

In the realization of these benefits, as well as in the promotion of the public welfare, it is often necessary that state attorneys temporarily assigned to other circuits be authorized to file informations therein. If, at a time when the resident state attorney is unavailable or disqualified, an information theretofore filed by such resident state attorney should be quashed upon motion, and a new information or indictment should become necessary, then under the construction of Section 10, Declaration of Rights, urged by defendant, the assigned State Attorney could not do so, and this would necessitate the summoning of a grand jury—one of the very things which Section 10 was designed to avert.

It is true that considerations of convenience, such as expediting the due administration of justice, or considerations

of sound public policy, should never be *controlling* in the construction of constitutional provisions, yet they may be of great assistance in ascertaining the intent and meaning of a constitutional provision as to which there may be some doubt, arising from the uncertainty or generality of the language used. 12 C. J., Constitutional Law, Sec. 46, p. 703.

Mr. Burton, State Attorney of the Tenth Judicial Circuit, under the executive order above set forth, became in effect, the State Attorney *pro tempore* of the Twelfth Judicial Circuit in so far as was necessary to fully effectuate the intent and purpose of said order. To that extent he was clothed with all the powers and privileges of the prosecuting attorney of the Twelfth Circuit, and, in the language of the Constitutional provision, he was "the prosecuting attorney of the court wherein the information," was "filed," for the time and purposes contemplated by the Governor's order. 18 C.J., District and Prosecuting Attorneys, Sec. 88, p. 1346.

We have recognized the authority of the judge of the court to appoint some suitable person to perform the duties of the regular prosecuting officer in cases of exigency where the latter is absent or unable to act. King v. State, 43 Fla. 211, 31 So. 254; Paleaz v. State, 107 Fla. 50, 144 So. 364.

This case does not present a question of an official delegating his authority; it involves the power and authority of the state itself to delegate authority to a State Attorney of one Circuit to act as such in another Circuit. Because of the disqualification of the resident State Attorney, only Mr. Burton, by virtue of the executive order, made under statutory authority, was authorized to act and to file the information, in the case at bar. Our conclusion is that this was permissible under said constitutional provision, construed in connection with Section 4743 C. G. L.

Although we have been unable to find any case directly in point, the following authorities involve some of the principles herein above set forth and applied: Poole v. State, *supra;* Vann v. State, *supra;* Skipper v. State, 114 Fla. 312, 153 So. 853; Walker v. State, 93 Fla. 1069, 113 So. 96; Anderson v. State, 115 Fla. 477, 155 So. 726; Pelaez v. State, *supra;* Stone v. State, 71 Fla. 514, 71 So. 634; Nance v. State, 41 Okl. Cr. 379, 273 Pac. 369; Byxbee v. State, 41 Okl. Cr. 272, Pac. 493; Lasley v. District of Columbia, 14 App. D. C. 407; Williams v. People, 26 Colo. 272, 57 Pac. 701; State v. Huett, 340 Mo. 934, 104 S. W. (2d) 252; State v. Winne, 45 S. D. 494, 189 N. W. 119.

The county commissioners in selecting the jury list from which the jury was drawn, in accordance with Sections 4443 and 4444, Compiled General Laws of 1927, selected only the names of male persons. Defendant contends that such selection was a denial to her of the equal protection of the laws of Florida and of due process of law, in contravention to Sec. 1 of the 14th Amendment to the Constitution of the United States. In support of her contention she cites Clarence Norris v. State of Alabama, 294 U. S. 587-599, 55 S. Ct. 579, 79 L. Ed. 1074, which held that the action of a state through its legislature, courts or executive or administrative officers, in excluding all persons of the African race, solely because of their race or color, from serving as grand jurors or petit jurors in the criminal prosecution of a person of the African race, denies to such person the equal protection of the laws contrary to the Fourteenth Amendment.

In Strauder v. West Virginia, 100 U. S. 303, 25 L. Ed. 664, the Supreme Court of the United States, in discussing the Fourteenth Amendment, said:

"We do not say that, within the limits from which it is not excluded by the Amendment, a State may not prescribe

the qualifications of its jurors, and in so doing make discriminations. It may confine the selection to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications. We do not believe the 14th Amendment was ever intended to prohibit this. Looking at its history, it is clear it had no such purpose. Its aim was against discrimination because of race or color. As we have said more than once, its design was to protect an emancipated race, and to strike down all possible legal discriminations against those who belong to it."

In construing any Constitutional amendment it is necessary to keep the main purpose steadily in view. Slaughter-House Cases, 16 Wall. 36, 21 L. Ed. 394: The main purpose of the Fourteenth and Fifteenth Amendments was to give the newly emancipated colored race complete equality of civil and political rights with all other persons and races within the jurisdiction of the states. They were intended to take away all possibility of oppression by law because of race or color. Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676; Virginia v. Rives, 100 U. S. 313, 25 L. Ed. 667; Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567.

Thus the intent and design of those amendments were utterly different from the reasons leading to the adoption of the Nineteenth Amendment. The situation confronting the persons theretofore held as slaves, when the thirteenth and fourteenth and fifteenth amendments were adopted, was quite different from those that prompted the adoption of the Nineteenth Amendment. Women had not been enslaved. They had been recognized as citizens and clothed with large property and civil rights. They had long been generally recognized in this country as, the equal of man intellectually, morally and socially. Opportunities in business and for college and university training had been freely open to them. Education of the youth of the land

had been largely entrusted to them. Laws protective to women on account of their sex, or exempting them from legal liability under certain classes of contracts, or imposing certain limitations upon married women with respect to the disposal of real property, were not changed or affected by the Nineteenth Amendment. Current discussion touching the adoption of the Nineteenth Amendment related exclusively to the franchise. The words of that amendment by express terms dealt solely with prohibiting any denial or abridgment of the right to vote based upon sex.

For these reasons the case on which defendant relies seems to us inapplicable to the present case. The Supreme Court of the United States has held that the denial to women by state statutes or laws of the right to practice law, Bradwell v. State of Illinois, 16 Wall. 130, 21 L. Ed. 442; In re Lockwood, 154 U. S. 116, 14 S. Ct. 1082, 38 L. Ed. 929, and to make contracts to perform labor by themselves more than specified numbers of hours within designated periods, Muller v. Oregon, 208 U. S. 412, 28 S. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957; Riley v. Massachusetts, 232 U. S. 671, 34 S. Ct. 469, 58 L. Ed. 788; Miller v. Wilson, 236 U. S. 373, 35 S. Ct. 342, 59 L. Ed. 628, L. R. A. 1915F, 829, violate no rights or privileges secured to women by the Fourteenth Amendment. Those rights appear to us quite as essential to the privileges and immunities of citizens and equal protection of the laws as the opportunity to serve as jurors, which service entails a burden of responsibility, and frequently of real hardship, which many male citizens would escape from if they could. Our conclusion is that the failure of the State to impose jury duty upon women has not deprived this plaintiff in error of the equal protection of the laws guaranteed to her by the Fourteenth Amendment to the Federal Constitution and the Declaration of Rights embraced in our Florida Constitution.

Commonwealth v. Wolosky, 276 Mass. 398, 177 N. E. 656 (cert. den. 284 U. S. 684, 52 S. Ct. 201, 76 L. Ed. 578); Powers v. State, 172 Ga. 1, 157 S. E. 195; State v. Dreher, 166 La. 924, 118 So. 85 (cert. den. 49 S. Ct. 36, 278 U. S. 641, 73 L. Ed. 556); In re Grilli, 110 Misc. 45, 179 N. Y. S. 795 (aff. 192 App. Div. 885, 181 N. Y. S. 938); Annotation in 71 A. L. R. 1336.

It follows that Sections 4443 and 4444, Compiled General Laws of Florida, 1929, derived from an Act adopted in 1893, which impose jury duty upon male citizens only, remain as valid statutes now as they were before the Nineteenth Amendment to the Federal Constitution was adopted. The legislature still has the power to prescribe the qualifications of jurors, and to impose this burden upon men alone if it sees fit so to do. It is not contended that juries composed of men would be less fair to woman defendants than would juries composed of women. Indeed, experience would lead to a contrary conclusion. The spirit of chivalry, and of deep respect for the rights of the opposite sex, have not yet departed from the heads and hearts of the men of this country.

The fourth and fifth assignments of error will be considered together. The fourth assignment is based on the denial of defendant's challenge for cause of the veniremen Hensley, who was then peremptorily challenged by defendant, and the fifth is based on the denial of the peremptory challenge by the defendant of the juror C. F. Hoffman after having exhausted her last peremptory challenge on Hensley. Mr. Hensley, in his *voir dire* examination, testified that to a certain extent he had formed an opinion; that to a certain extent that opinion was with him at the time of the trial; that it could be "dissolved" by the evidence; that if not dissolved by the evidence it would influence him in

making up his verdict. Then Mr. Hensley was carefully examined by the Court, a part thereof being as follows:

"Q. Is that opinion, which you say you formed, one that will readily yield to the sworn testimony in the case?

"A. Yes, sir, it will.

"Q. And in arriving at your verdict in this case, if accepted as a juror, you can and will be governed solely and exclusively by the testimony you hear from the witness stand, disregarding any such opinion as you may have formed?

"A. Yes, sir."

After denying the challenge for cause, the court denied the request of defendant to question the juror further. But the court stated that it had ruled, and deemed no further questions necessary.

In Jeffcoat v. State, 103 Fla. 466, 138 So. 385, the court said:

" 'The fixedness or strength of an existing opinion is the essential test of a juror's competency, when his competency is challenged upon that ground, and the Court should look specially to such state of mind in passing upon the question of competency. If the juror's opinion is not fixed and settled, and he is not warped by prejudice, but the opinion entertained by him is only such as would naturally spring from public rumor or newspaper reports, and his mind is open to the impressions it may receive from the evidence so that such opinion will readily yield to the evidence and the law, he is competent.' Blackwell v. State, 101 Fla. 997, 132 Southern 468."

Upon the issue of fact raised by a challenge to a juror, in a criminal case, on the ground that he had formed an opinion as to the issues to be tried, the court will be called upon to determine whether the juror has formed such a fixed opinion as would bias his verdict. The question thus

presented is one of mixed law and fact, and to be determined, as far as the facts are concerned, like any other issue of that character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest.

The rule has also been considered with specific reference to the competency of prospective jurors in the following cases, in all of which as strong, if not a stronger, showing was made against the competency of the juror than in the case at bar: English v. State, 31 Fla. 340, 12 So. 689; Brown v. State, 40 Fla. 459, 25 So. 63; as well as the Blackwell and Jeffcoat cases, *supra*.

The trial judge having properly overruled the challenge for cause of the venireman Hensley, it follows that the defendant was not prejudiced by the order overruling the peremptory challenge of the juror Hoffman.

The defendant contends that the trial court erred in trying the cause when the defendant was not formally arraigned and did not plead, save specially, to the information. The record shows that the defendant by and through her attorney filed a motion to quash the amended information, filed a plea in abatement, to the amended information, filed a challenge to the array and motion to quash the venire. All of which were overruled and denied by the trial court. As the trial of defendant and empaneling of a jury was begun the record shows that the defendant announced she was "ready for trial on the first count of the amended information," the second count having been "nol prossed."

In Padgett v. State, 117 Fla. 75, 157 So. 186, it is said: (1st and 2nd Headnotes.)

"Statute requiring arraignment and pleading in terms to indictment is directory, and provisions thereof may be waived by defendant. (Comp. General Laws 1927, Sec. 8375).

"Formal arraignment and entry of pleas *held* waived, where defendants proceeded with trial and took every advantage available to them, and where indictment was read to jury in defendant's presence and they thoroughly understood nature of charge. (Comp. Gen. Laws of 1927, Sec. 8375)." See Bassett v. State, 44 Fla. 2, 33 So. 262; Dixon v. State, 13 Fla. 631.

There is no contention that the defendant was not fully aware of the charge against her under which she was put on trial. When she was called to the bar of the court, the record shows that she announced ready for trial and thereupon proceeded to participate in the trial. It is quite evident that all concerned thoroughly understood the defendant was charged by the State of Florida with the offense of perjury as charged in the first count of the information, and that the defendant was contending upon the trial before the jury that she was not guilty of that offense. Nothing could have been gained in behalf of defendant or lost upon behalf of the state for the defendant to have been required to enter a more formal plea than that which was embraced in her announcement that she was then ready for trial on the charge presented by the State.

During the trial of the case at bar the court reporter was permitted to read the entire testimony given by the defendant Mrs. Hall in the first trial of State v. Ford, *et al.,* as well as the testimony of all the witnesses for the State in that case. The defendant objected to the reading of this tesimony upon the ground that the matters and things set forth as false testimony in the information was the only part of the defendant's testimony which was material and that the other portions of her testimony, and all of the testimony of the other witnesses for the State upon said first trial of State v. Ford, *et al.,* was irrelevant and immaterial, and especially that portion of the defendant's

testimony with regard to certain incriminating statements testified to 'by her as having been made by Bill Taylor, alias Gus Harris, a co-defendant with Squash Ford on said first trial, in view of the fact that the second count of the information, charging Mrs. Hall with having testified falsely as to said certain statements made by Bill Taylor, had been "nolle prossed" by the court upon the motion of the State Attorney before the trial of the case was entered upon.

If there was any error on the part of the court in admitting all of said testimony above referred to, the error was harmless, because the defendant in the case at bar freely admitted upon the second trial of the case of State v. Ford, *et al.*, that all of her testimony upon the first trial with respect to the incriminating statements which she testified to as having been made by both Squash Ford and Bill Taylor were false and untrue. While it is unnecessary for us therefore to rule upon the question of the materiality and relevancy of all this testimony, we might observe that this court is not at all convinced that the court below erred in admitting it. The burden was upon the State to prove, not only the falsity, but also the materiality and wilfulness of the defendant's statements alleged in the information as constituting perjury, and the court admitted it for the purpose. See Yarborough v. State, 79 Fla. 256, 83 So. 873; 48 C. J. 891-893; Sections 152-154; also Sections 156-157 on page 894; and Parrish v. State, 18 Fla. 902. In said Section 157 of 48 C. J., it is stated that the statements of the witness indicted for perjury may be shown by the testimony of the court reporter or stenographer who took down the testimony of the accused, or by the introduction of the transcript of the testimony, and such portions of the record as are necessary to show what the testimony was may be read by the court reporter.

In this case the defendant, through her counsel, waived

any objection upon the ground that the testimony so intro-
duced was secondary evidence in that it was not the original
stenographic notes of the court reporter. In other words
the waiver pertained to reading in evidence from the type-
written transcript of the stenographer's notes rather than
from the original stenographic notes. This waiver did not
extend, of course, to a waiver of the presence of the wit-
nesses whose testimony was so read. One of the grounds
of the objections interposed by the defendant was that this
reading into evidence of the testimony of the State's wit-
nesses upon the first trial deprived the defendant of the
right to be confronted by the witnesses against her.

The case of Todd v. State, 13 Ala. App. 301, 69 So. 325
is in point here. The first three headnotes in that case read
as follows:

"1. Act Aug. 26, 1909 (Acts Sp. Sess. 1909, p. 266)
Sec. 7, providing that all transcripts furnished by the of-
ficial stenographer, who is, under Section 3, a sworn officer
of the court, shall be certified to by him over his signature,
and when so certified shall be *prima facie* evidence of the
proceedings in the cause, and shall be filed therein, under
which a duly certified transcript of defendant's testimony
in a murder trial was admitted in his prosecution for per-
jury committed while testifying at such trial to prove his
testimony therein, did not deprive defendant of his right,
under Const. Art. I, Sec. 6, of being confronted with the
witnesses against him, since proof of essentially docu-
mentary facts by documentary evidence when the original
record of an officially authenticated copy is made competent
by statute is an exception to the constitutional guaranty,
finding support in the principles of public policy, expedi-
ency, or necessity.

"2. Under Const. Art. I, Sec. 6, entitling an accused to
be confronted with the witnesses against him, construed in

accordance with the common law, which did not recognize any right to a confrontation as distinguished from the right of cross-examination, a public record declared by law to be evidence that imports verity affords no reason for the application of the constitutional guaranty, as cross-examination can have no application to such evidence.

"3. In a prosecution for perjury committed when testifying as a witness in a murder trial, the certified transcript of the official stenographer's notes of such testimony, by Act Aug. 26, 1909, (Acts Sp. Sess. 1909, p. 266) Sec. 7; declared to be *prima facie* evidence of the proceedings in such cause, was admissible as being the best evidence of defendant's testimony, more accurate than the uncertainty of human recollection."

Our Statute, Section 4877 C. G. L., is similar to the Alabama statute regarding the admissibility of a certified transcript of the testimony. Said Section provides that the report of an official stenographer, when written out in long hand or printed in type, and certified to by him as being a correct statement of the testimony and proceedings in the case, shall be *prima facie* a correct statement of such testimony and proceedings, provided his signature to such certificate be duly acknowledged by him before a notary public or some judicial officer of the court.

In connection with the question of the admissibility of this testimony, see Underhill's Criminal Evidence, 4th ed. Sections 736, 739, and Wharton's Criminal Law, 12th ed. Vol. 2, pages 1832 and 1843; 48 C. J. 891-7; 21 R. C. L., Sec. 19, 273-275; Ann. 87 A. L. R. 1267.

It would have entailed a great deal of the time of the court and no doubt tended to confuse the jury if the State had been required to go through all of this testimony and pick out and read to the jury more or less disconnected statements here and there which were absolutely material

but which in their disjointed form would have been difficult to thoroughly understand.  The Court therefore permitted the official court reporter to read it all in evidence upon the theory that it was all relevant to show the materiality of the testimony of the defendant upon the first trial, which she repudiated upon the second trial.  This was doubtless the sensible and practical method of handling the situation and we find no reversible error therein; nor do we find any merit in the contention that the defendant was thereby deprived of the right to be confronted by the witnesses against her.  The reasons advanced by the Alabama Court in the case above cited are we think a sufficient answer to this contention.  The materiality of the defendant's testimony upon such first trial could be sworn by putting before the jury the issues involved and the testimony of the other witnesses at said trial, or so much thereof as was necessary to that purpose, and this could be done by reading the official stenographic report of such testimony, as it was actually given at the time, much more accurately than could have been done by putting such witnesses on the stand to testify what, according to their best recollection, they had testified to some months or years before.  The question was, *what had they testified* on such first trial, not what they might testify at the present time, and it is plain that this could best be shown by the report of the official stenographer, which, under the statute, was made *prima facie proof* thereof.  This method was fair to both the prosecution and the defense, much more accurate than ordinary human recollection, and not in violation of any constitutional provision.

The Court properly limited the testimony of the other witnesses on the first trial to the question of materiality of defendant's alleged false statements.

In his charge to the jury the able trial judge expressly

instructed them that it was incumbent upon the state to prove that the testimony of the defendant, which the information alleged to be perjured, was *material* to the issue then being tried, which issue was, in his words, "whether or not Lawrence E. Ford, alias Squash Ford, was guilty of the murder in the first degree of Donald Norton;" and "that it was for that purpose, and that alone, that the record in that case was read before you, that you might so determine whether or not her alleged testimony was material to the issue then being tried. As to whether or not those persons were guilty or not is not before you here, but as to whether the testimony which it is alleged Mae Hall gave in that trial was material to that issue must be established beyond all reasonable doubt." Elsewhere in his charge the trial judge correctly defined the issue on said first trial. So the contention under the 12th and 14th assignments of error that the Court did not limit his charge to the first count of the information, but also embraced therein and submitted to the jury the second count, which had been nol prossed, is not well grounded. The record also shows that at the beginning of the trial, "the respective parties announced ready for trial on the first count of the amended information."

When on the trial of the case at bar the State offered to introduce all of the testimony of Mae Hall on the second trial of Lawrence Ford, *et al.*, by having read in evidence the transcript which the official stenographer had made from his original notes, which testimony the State offered for the purpose of proving the falsity of her testimony on the first trial, the defendant objected upon several grounds, one of which was that the falsity of her alleged testimony on the first trial had not been shown. The State then withdrew the stenographer for the time being and placed two other witnesses upon the stand for the purpose of

making such proof; viz., Robert Mickler and Lawrence E. Ford. Their testimony, which was substantially the same as that given by them on the previous trial above referred to, tended to prove the falsity of Mrs. Hall's testimony on such first trial, and if believed by the jury, was probably sufficient for that purpose.

This was the proper procedure. It is quite generally held that it is not sufficient to prove a charge of perjury by merely proving that the defendant had, at different times, testified to two opposite things irreconcilable with each other. There must be testimony outside of the defendant's own contradictory statements as to which of such statements is false. Freeman v. State, 19 Fla. 552; 48 C. J. 900. And to sustain a conviction of perjury, the offense must be proved by the oaths of two witnesses, or by the oath of one witness and other independent corroborating circumstances which are deemed of equal weight with the testimony of another witness. Ward v. State, 83 Fla. 311, 91 So. 189, and cases cited.

As has already been briefly referred to, the parties had stipulated that the typewritten transcript of the stenographer's notes of the testimony of the State's witnesses on both trials, which had been identified by him and marked as exhibits, or any part thereof, might be read to the jury during the trial subject to any objections that "may be made to the court as to the relevancy and materiality of the matters contained "therein," "but that no objection shall be made on the basis that matters therein contained are secondary evidence, not the original stenographic notes of the court reporter, which objections are hereby waived."

After adducing the testimony of the two witnesses above mentioned, the State then offered in evidence the transcript of all of the testimony of Mrs. Hall given at the second trial of the case of State v. Ford, *et al.* This was

admitted over the objection of the defendant, which was made upon the grounds previously interposed. These grounds were that the evidence sought to be elicited was (a) immaterial, and (b) irrelevant, and (c) that evidence of the falsity of the alleged testimony of Mrs. Hall had not yet been shown—which latter ground was met as above indicated. While some portions of this testimony may have been irrelevant, they were not separately pointed out or objected to. Some portions of it, where the defendant admitted that the statements set forth in the information, which she had testified to under oath on the first trial, was false, were distinctly relevant. But the State went further, and introduced all of it. If the State had not done so, the defendant probably would have insisted, and perhaps under the circumstances properly so, that if the State offered any part of it, all of it should go to the jury. Yet, by introducing all of this testimony in evidence of its own motion, the State brought about an anomalous situation.

The testimony given by Mrs. Hall on the second trial of the said murder case was read in evidence, as transcribed by the court reporter, in question and answer form, in full, and covers pages 295 to 340 of the record before us. It appears therefrom that defendant freely admitted that her testimony on the first trial, as charged in the information in this case, was false and untrue, but, in the same breath, as it were, she made very serious charges against the then resident State Attorney, who was at that time questioning her, and the Sheriff of Glades County, and a certain detective who was working on the case, as to how this testimony was obtained. It is not necessary for us to go into the details related by her, but the substance of it was that this testimony was obtained from her by duress and compulsion, and threats of prosecution that is, threats of herself and son being sent to the penitentiary, where her husband had

already been sent, her son then being under arrest on a charge of felony, which threats put her in great fear.

It has been held that: "Evidence to rebut the existence of a corrupt intent is admissible in favor of the accused, as, for example, that the statement was made through mistake, or duress," etc. 48 C. J. 891-2; Carroll v. State, 16 Ala. App. 454, 78 So. 717; 21 R. C. L. 271. And it has been held that the accused may properly insist that the court instruct the jury to determine whether or not such testimony was voluntary. 12 R. C. L. 271.

To rebut this portion of her testimony, the State, over defendant's objections, placed upon the stand in this case the resident State Attorney, Hon. Roy D. Stubbs, and Sheriff Wiggins, two of the persons against whom the witness had made these charges in said testimony thus introduced by the State, and also a certain detective named Gasque, who had been one of the investigators in the Ford case, and who was present at one or more of the conversations which the said State Attorney and Sheriff had had with the defendant and in which she had testified threats. were made. The jury evidently believed the testimony of these witnesses, to the effect that no duress or compulsion was used, as manifested by their verdict.

While State Attorney Stubbs was on the stand, the defendant objected to this rebuttal evidence upon the ground that it was irrelevant to the issues, and also because the State was endeavoring to break down the testimony offered by the State itself. At this point, the record shows the following:

"JUDGE BELL:

"In support of that objection: this is an unusual procedure we are having here; this procedure up to this time is not a controversy between witnesses offered for the state and for the defendants; all of the evidence that has been

offered so far has been offered and vouched for by the State of Florida. As I understand it, these records and transcripts were offered for only one purpose and that was to show the materiality of the alleged false testimony at the trial and they have gone on upon that assumption that they would and did offer it for that purpose alone; but now we have this peculiar circumstance—the state having offered these records, and now the State of Florida following up and putting witnesses upon the stand to impeach the contents of these records and we submit that the state has only the right to impeach testimony of defense witnesses; that the State has no right to impeach its own testimony or its own evidence.

"Mr. Burton: It is not the question of impeachment your Honor; this testimony, Mr. Bell must bear on the matter of the charge in the information and is introduced to show that the false testimony was material to the issues then being tried.

"Court: I can see only one matter on which it could be material; the defendant is charged with having wilfully made statements that it is alleged were untrue, and only to that extent do I see any materiality in this testimony.

"Mr. Burton: This goes to the wilfulness of the perjury.

"Court: It is the only thing it can be admissible for, and as to the other, you cannot dispute the record—it will be received only for that purpose."

"The objection is overruled, exception noted."

In considering this question of the correctness *vel non* of the court's overruling the objections interposed by the defendant on the trial of the case at bar, to the testimony adduced by the State to rebut a portion of the testimony of Mae Hall on the second trial of the Ford case, which the State had itself introduced in evidence, it is pertinent, in

view of the arguments advanced, to refer briefly to the circumstances attendant upon the giving of this former testimony, as disclosed by the transcript thereof introduced by the State.

It appears that when the second trial of Ford, *et al.*, was in progress, the State, after examining a number of witnesses, called Mae Hall to the stand. A number of preliminary questions were propounded to her, and then the State Attorney asked her to state "whether or not, on the day these boys were killed, you saw Squash Ford and Robert Mickler at your place in Arcadia at ten o'clock in the morning?" To this she answered that she did not remember that day. Then she was asked: "You testified at the last trial, didn't you?" To which she answered "Yes, sir."

The defense then objected to any effort to bring out the testimony of the witness on the previous trial. Whereupon the State Attorney stated to the Court that he was reliably informed that the witness was a hostile witness and would repudiate her testimony given on the former trial; that he therefore asked the Court to make this witness a court witness, allowing opportunity for cross examination, both to the State and defendant. The jury was sent out and the pros and cons of this question argued at some length by counsel for both sides, after which the court granted the State's motion and made the witness a court witness. Counsel for the defense had argued, in opposition to the motion, that the witness had not thus far testified to anything adverse to the State, and that the State Attorney was attempting by this method to get before the jury the testimony given by the witness on the former trial.

While the court did not, as is usually done, first examine the witness before allowing examination by counsel, the court was probably acting upon the general principles laid down

in Brown v. State, 91 Fla. 682, 108 So. 842 and cases cited therein. The correctness of that ruling in this, a subsequent and different case, is not vitally important here. We might observe, however, that a trial court has considerable discretion in matters of this nature, and we are not convinced that there was any abuse of discretion shown in the above ruling. As to calling a witness as a court witness, we have said that: "The right to call or not to call such a witness is vested in the presiding judge." Buchanan v. State, 95 Fla. 301, 116 So. 275. As to the right of a party to *impeach* his own witness when he has proven to be an adverse witness, see Section 4377 C. G. L., construed in Adams v. State, 34 Fla. 185, 15 So. 905; Rowe v. State, 128 Fla. 394, 174 So. 820, and other cases, which are not directly in point here.

After Mae Hall had thus been made a court witness, the State Attorney put her through a long and rigorous examination, covering a wide range, in the course of which she unhesitatingly denied the truth of practically all of the material statements made by her on said first trial, including all of those alleged as perjury in the information in the instant case, claiming that she thus testified falsely under duress and threats as hereinabove referred to; that she regretted the wrong she had done "these innocent boys" on the first trial, and had determined to tell the truth on this second trial, even if she had to go to the penitentiary for it.

It may be, and probably was, the purpose of the State Attorney, as is charged by counsel for plaintiff in error in their brief, to get the witness, if possible, to give the same testimony on the second trial as she had given on the first, and if not, to lay the foundation for a prosecution for perjury. Thus, towards the close of his examination, the State Attorney asked the witness: "Have I ever said anything to you at any place that would carry any suggestion

of any kind except that we wanted you to tell the truth regardless of who it helped or hurt?" To which she answered: "Well, in a threat." To this the State Attorney countered: "Any kind of a threat if you didn't tell the truth you would get into trouble, and I make that again right now."

Counsel for defense contend that the "trouble" referred to is this prosecution for perjury, and that the record shows that if Mae Hall had yielded to this threat of the State Attorney and had made the same treatment that she had made before, which the State then contended was true, she would not now be under prosecution; that here we have a case of a woman being prosecuted for perjury because she would not continue to swear to statements now contended by the State to have been false. But these arguments are, when analyzed, beside the point. The rule of evidence undoubtedly is that on a trial for perjury, the testimony of the defendant, given under oath on a subsequent trial, which is contradictory to his or her former testimony on a previous trial which is alleged to have constituted perjury, or which expressly admits the falsity of such former testimony, is admissible in evidence.

We return now to the question of whether the court committed error in admitting the testimony of the State Attorney, the Sheriff and the detective to rebut that part of the testimony of Mae Hall on the second trial wherein she insisted that her testimony on the first trial was obtained by duress. Counsel for plaintiff in error contend that the State, having introduced all of it together,—her admissions to prove the falsity of her former testimony, and also her statement of her reasons given in connection therewith as to why she gave such alleged false testimony —could not consistently deny or rebut that part of her testimony setting forth such reasons—that is, her testimony

as to duress. For the reasons hereinabove stated, the defendant had no cause to complain when the State Attorney introduced her testimony in full—that which was advantageous to the defendant as well as that was incriminating in its nature. The latter was clearly admissible (22 C. J. 343) and if the State had not offered the other part, charging duress, the defendant most probably would have done so, and would have had the right to do so. But the State having introduced it all, the question of the State's right to rebut the truth of any part thereof presents an unusual and difficult problem. The lower court admitted this rebuttal testimony of the resident State Attorney, the Sheriff, and the detective on the theory that it was relevant to the issue of whether the alleged false testimony was wilfully given, and should be admitted, in spite of the fact that the State had introduced the very evidence, tending to show it was not wilfully given, which the State was seeking to rebut. The question is not free from doubt, but we will resolve the doubt in favor of the lower court's ruling; as the case must be reversed on another point. Furthermore, in the conduct of trials generally, including the order of proof and the introduction of evidence, much must be left to the discretion of the trial judge. See Romano v. Palazzo, 83 Fla. 243, 91 So. 115 and cases cited.

Defendant also assigns as error the giving of the following charge:

"Much has been said to you about compulsion or coercion and I charge you that a person may be excused from perjury, particularly so where she had given false testimony, material testimony as alleged in this case, under compulsion and coercion, but to constitute coercion or compulsion it must be more than fear apparent—a mere fear alone needlessly or cedulously entertained can never excuse or justify perjury, but to constitute coercion or compulsion to an

extent which may be an excuse it must be shown, or its existence must at least be indicated sufficiently to create in your minds the reasonable doubt whether or not they exist, to such an extent as you believe that that testimony was given under force or circumstances which impelled her against her will and that she was then subjected to danger, that is real danger, that the danger was present, that it was existent at the time, that it was imminent and that it was impending and not to be avoided."

The correctness of this charge appears to be sustained by one case which has been brought to our attention. In Bain v. State (1890) 67 Miss. 557, 7 So. 408, a prosecution for perjury, the sole defense attempted to be proved was that the life of the accused had been threatened unless he would go into court and testify so as to criminate himself and certain other persons who were suspected of murder. Holding that evidence tendered to show such threats was properly excluded, the court said:

"The single question is whether a man may justify or excuse deliberate perjury against the life and liberty of others, on the ground that he was coerced to the perjury by fears engendered by the threats of others. We are not aware that a similar question has ever been presented for decision. We can conceive of cases in which an act, criminal in its nature, may be committed by one under such circumstances of coercion as to free him from criminality. The impelling danger, however, should be present, imminent, and impending, and not to be avoided. Such was not the character of the duress here, and the appellant was not only possessed of the power and right of protecting himself, but he also could have appealed to the law to shield him from the threatened danger * * * The social system would be subverted, and there would be no protection for persons or property, if the fear of man, needless

and cravenly entertained, should be held to justify or excuse breaches of the criminal laws of the state, and to excuse or justify the crime of perjury."

In the case of Hardin v. State, 85 Tex. Crim. Rep. 220, 211 S. W. 233, 4 A. L. R. 1308, it was said:

"Appellant complains that the court refused to give a special charge that the jury would not consider for any purpose the statement made by the appellant before the grand jury of Hood County, unless the same was freely and voluntarily made. The authorities cited by appellant in support of this protection are cases in which there was evidence presented on the trial of a denial by the party charged of the warning given, or of the voluntary character of the statement made, in which case the courts correctly hold the question of the voluntary character of such statement must be admitted to the jury; but comparing the cases giving rise to the opinions cited, with the instant case, it seems to us to demonstrate that those authorities are not the law of this case. This appellant was not subpoenaed by the state to go before the grand jury, or asked in any way to appear there, but went freely and voluntarily, of his own accord, and after making his appearance and offering himself, as such witness, and before he testified, he was fully warned by the district attorney of the consequence of his giving testimony, and told that it would be used against him upon any trial of himself that might follow such investigation. He then testified denying the guilt of himself and the woman, and denying the matters alleged to have occurred in Tarrant County, and when these matters were written out and presented to him he seems to have signed them without any demurrer whatever. The court fully cared for his interest in the main charge."

Even in homicide cases, the danger which the law deems sufficient to justify the taking of life in self defense need

not be *actual* danger. The familiar law in such cases is that, though the danger need not be actual, nor the necessity to kill real, yet the circumstances existing and as they appear to the slayer at ·the time must be such as would induce a reasonably cautious and prudent man to believe that the danger was actual and the necessity real in order to justify acting upon that belief. Surely no higher degree of proof of danger should be required in proving the defense of duress or coercion in perjury cases than is required in proving self defense in homicide cases.

Our conclusion·is that in·charging the jury in this connection that the jury must believe from the evidence that at the time the testimony was given the defendant was then subjected to real, present danger, existent at the time, imminent and not to be avoided, the trial court committed reversible error, for this charge dealt with a matter of vital import to the defendant in the light of the evidence. It was only necessary that the danger referred to was a real, imminent and impending danger; or that under all the circumstances shown in evidence the defendant had reasonable grounds to believe that such danger was real, imminent and impending, and did so believe at the time she was testifying, and gave such false testimony because of such belief.

Reversed and remanded.

TERRELL, C. J., and WHITFIELD, J., concur.

BUFORD and CHAPMAN, J. J., dissent.

THOMAS, J., not participating, as this case was submitted before he became a member of the Court.

---

NOTE.—The first count of the information upon which this case was tried, and which it is stated in the opinion would be set forth in a note thereto, is, omitting the caption, as follows:

Buford, J., (dissenting)—I am unable to agree with the conclusion reached in opinion prepared for the Court by Mr. Justice Brown. The conclusion is based upon the record showing that the court gave the following charge:

"Much has been said to you about compulsion or coercion and I charge you that a person may be excused from perjury, particularly so where she has given false testimony, material testimony as alleged in this case, under compulsion

"In the Name and by authority of the State of Florida:
"L. Grady Burton, State Attorney of the Tenth Judicial Circuit of the State of Florida, acting as State Atorney of the Twelfth Judicial Circuit of the State of Florida, by virtue of an executive order of the Governor of Florida, prosecuting for the State of Florida in the County of Sarasota, under oath information makes that Mae Hall of the County and State aforesaid on the 13th day of October in the year of our Lord One Thousand Nine Hundred and Thirty Six, in the County and State aforesaid, before the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida, at a regular term thereof, whereof the Honorable George W. Whitehurst was Judge, on an issue within the jurisdiction of the said Court duly joined and trial thereof before a jury of said County and State between the State of Florida as plaintiff and Lawrence E. Ford, alias Squash Ford, Bill Taylor alias Gus Harris, Parker Mansfield and Finis Williams, as defendants, was in due form of law, sworn by the Honorable W. Fred Sills, Deputy Clerk of said Court, having competent authority to administer to her, the said Mae Hall, the oath to tell the truth, the whole truth and nothing but the truth touching the matters then and there in controversy between the said plaintiff and said defendant who were then and there on trial for the first degree murder of Donald Norton. Whereupon, it then and there became and was a question material to the said issue, whether the said Lawrence E. Ford, alias Squash Ford, was guilty of the first degree murder of the said Donald Norton and to this material issue the said Mae Hall, being duly sworn as aforesaid to testify in the trial of the cause aforesaid then and there pending and on trial as aforesaid,

and coercion, but to constitute coercion or compulsion, it must be more than fear apparent—a mere fear alone needlessly or credulously entertained can never excuse or justify perjury, but to constitute coercion or compulsion to an extent which may be an excuse it must be shown, or its existence must at least be indicated sufficiently to create in your minds the reasonable doubt whether or not they exist, to such an extent as you believe that that testimony was given under force or circumstances which impelled her against

in the Circuit Court in and for Sarasota County, Florida, then and there on the 13th day of October, 1936, did wilfully, knowingly, feloniously, falsely and corruptly testify to and before the Court and Jury then and there trying said cause matters and things material to the issue therein in substance and effect as follows:

"That she remembered when those boys (meaning Donald Norton, Lincoln Whidden and Marvin Morow) were killed; that at about ten o'clock on the morning of the day those boys (meaning Donald Norton, Lincoln Whidden, and Marvin Morrow) were killed, Lawrence E. Ford, alias Squash Ford, and Robert Mickler stopped at her place in Arcadia; that on that day (meaning the day Donald Norton, Lincoln Whidden and Marvin Morrow were killed) at the time he was at her place in Arcadia, Lawrence E. Ford, alias Squash Ford, bought eight or ten sandwiches and had them put in a paper bag to take to the rest of the boys; that while he was at her place at the time last above mentioned Lawrence E. Ford, alias Squash Ford, had a pistol buckled on him which he said was a forty-five; that at the time and place last above mentioned Lawrence E. Ford, alias Squash Ford, in her presence, told her husband, Obe Hall, that he (meaning Lawrence E. Ford, alias Squash Ford) could put anything on the spot with his forty-five; that a few days before these boys (meaning Donald Norton, Lincoln Whidden and Marvin Morrow) were killed Lawrence E. Ford, alias Squash Ford, was at her place in Arcadia and made a statement to Obe Hall, her husband, in her hearing that there was something going to happen because they are going to line up and that there was some cow stealing sons of bitches was going to be

her will and that she was then subjected to danger, that is real danger, that the danger was present that is it was existent at the time, that it was imminent and that it was impending and not to be avoided."

The infirmity, if any, of the charge appears to be in the use of the language: "to such an extent as you believe that that testimony was given under force or circumstances which impelled her against her will and that she was then subjected to danger, that is real danger, that the danger was

---

sorry of going in the woods; that a few days after these boys (meaning Donald Norton, Lincoln Whidden and Marvin Morrow) were killed Lawrence E. Ford, alias Squash Ford, came back to her place in Arcadia and on this occasion she heard Lawrence E. Ford, alias Squash Ford, tell her husband, Obe Hall, that when he (meaning Lawrence E. Ford, alias Squash Ford) was told to put them on the spot he surely could do it and that there were three men killed and he helped kill them and that he was not by himself, but that there were two other men with him; all of which testimony was material matter to the issue being tried respecting which her said oath was taken. And the said Mae Hall then and there well knew that her said statements and testimony in the particulars aforesaid were false, perjured and untrue; whereas in truth and in fact the said Mae Hall then and there well knew that Lawrence E. Ford, alias Squash Ford, and Robert Mickler neither stopped at nor were they present at her place in Arcadia about ten o'clock in the morning or at any other time during the day on which those boys (meaning Donald Norton, Lincoln Whidden and Marvin Morrow) were killed; and the said Mae Hall then and there well knew that the said Lawrence E. Ford, alias Squash Ford, did not on that day (meaning the day that Donald Norton, Lincoln Whidden and Marvin Morrow were killed) buy at her place in Arcadia eight or ten sandwiches and have them put in a paper bag to take to the rest of the boys; and the said Mae Hall then and there well knew that on that day (meaning the day that Donald Norton, Lincoln Whidden and Marvin Morrow were killed) that the said Lawrence E. Ford, alias Squash Ford, was not at her place in Arcadia with a pistol buckled on him which he said

present, that is it was existent at the time, that it was imminent and that it was impending and not to be avoided.", because this language in the charge was calculated to limit the jury to the determination of whether or not there was an actual real present danger as contra-distinguished from an apparent present existing danger.

Conceding that the language used in the charge was er-

---

was a forty-five; and the said Mae Hall then and there well knew that Lawrence E. Ford, alias Squash Ford, did not on that day (meaning the day that Donald Norton, Lincoln Whidden and Marvin Morrow were killed) at her place in Arcadia or at any time or place in her hearing have a conversation with her husband, Obe Hall, in which he, the said Lawrence E. Ford, alias Squash Ford, made the statement that he could put anything on the spot with his forty-five; and the said Mae Hall then and there well knew that the said Lawrence E. Ford, alias Squash Ford, did not go to her place in Arcadia a few days before these boys (meaning Donald Norton, Lincoln Whidden and Marvin Morrow) were killed, nor at any other time and in her hearing have a conversation with Obe Hall, her husband, in which Lawrence E. Ford, alias Squash Ford, made the statement that there was something going to happen because they was going to line up and there was some cow stealing sons of bitches going to be sorry of going in the woods; and the said Mae Hall then and there well knew that Lawrence E. Ford, alias Squash Ford, did not go back to her place in Arcadia a few days after these boys (meaning Donald Norton, Lincoln Whidden and Marvin Morrow) were killed or at any other time and tell Obe Hall, her husband, in her hearing, that when he (meaning Lawrence E. Ford, alias Squash Ford) was told to put them on the spot he surely could do it and that there was three men killed and that he (meaning Lawrence E. Ford, alias Squash Ford) helped kill them and that he (meaning Lawrence E. Ford, alias Squash Ford) was not by himself and that there was two others with him, * * * contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Florida."

roneous, I think it was harmless error because the testimony in regard to the coercion was not sufficient to show that the accused was under any apparent danger of death or great bodily harm at the time the false testimony was given. If she was under any coercion at all it was the fear of some future punishment or prosecution and, according to her own testimony, she was not under such fear or coercion as would constitute a defense for committing the crime of perjury.

With the remainder of the opinion I agree, but my conclusion is that the judgment should be affirmed and not reversed.

CHAPMAN, J., concurs.