25 So.2d 427

### BOOTH v. STATE.

6 Div. 337.

Supreme Court of Alabama.

March 7, 1946.

Rehearing Denied April 11, 1946.

Beddow, Ray & Jones, of Birmingham, for appellant.

Wm. N. McQueen, Atty. Gen., and Clarence M. Small, Asst. Atty. Gen., for the State.

Counsel for defendant reserved exceptions to the oral charge as follows:

GARDNER, Chief Justice.

This appeal is from a conviction of murder in the second degree with punishment fixed at imprisonment for a period of twenty-five years.

Defendant is charged with the murder of his daughter, Addie Ruth Booth, a young girl near fourteen years of age, who was well developed and rather large for her age. She lived with her father in a house at Kimberly, Alabama, and not far from Warrior. On the night of Wednesday, October 25, 1944, about nine o'clock she was brought to Hillman Hospital and carried to the emergency ward. The defendant, her father, accompanied her in the ambulance from his home to the hospital. She was suffering from a gunshot wound which entered her body just below the chest bone, the bullet ranging downward at an angle of seventy-five degrees. This gunshot was from a .22 caliber rifle which had been sawed off, both at the barrel and stock, so that it resembled a large pistol. For convenience it will be referred to as a pistol.

After she had been at the hospital some two hours, and at eleven o'clock that night, in the presence of some half dozen persons, including two of the physicians, a supervisor, a detective and deputy sheriff, the girl made a statement to the effect that her father shot her in the chest with a pistol. She had been told by the resident physician that she was in a serious condition and would probably die from that wound. To use the language of the physician: "I made that clear to her in front of the other witnesses there." The statement Addie Ruth made was in the presence of these witnesses and was taken down by one of them as she talked—"they were asking questions and wrote down the answers." Upon completion of the statement which was read back to her, she signed it in the presence of these witnesses, and they likewise affixed their signatures as witnesses. This statement was offered in evidence and reads as follows:

"My name is Addie Ruth Booth. I am 14 years of age and live with my father J. W. Booth at Kimberly, Ala. My mother is dead. My father works for City Transfer Company in Bham. On Monday morning October 23rd I was with Pearl and Bonnie Morgan and Robert Booth in an

automobile accident. Wednesday morning about 1:30 my father came into the room where I was sleeping. He whipped me while I was in bed. He had just come in from work. He was standing at my head and shot me in the chest with a pistol. My father dressed the wound and did not call the doctor. My grandmother came over to the house and called Dr. Ballard this morning. He did not examine me. My father threatened to kill me if I told that he shot me. He was about 10 ft. from me when he shot me. The pistol was hanging up on the wall in his room. I realize that I am in a dying condition and that I have been told that I am in a dying condition. He beat me with a belt. No one was there but my father and I. This statement is given voluntarily in the presence of these witnesses this the 25th day of October 1944 at 11:00 p. m.

"Addie Ruth Booth."

■ The foregoing statement was admitted in evidence over defendant's strenuous objection. As has been often observed, no hard and fast general rule can be laid down to control the admissibility of dying declarations. The circumstances of each case must be considered—the condition of the person as well as what he says in regard to approaching dissolution. In Parker v. State, 165 Ala. 1, 51 So. 260, 262, the following excerpt from Professor Wigmore on this subject was quoted with approval:

"No rule can be laid down. The circumstances of each case will show whether the requisite consciousness existed; and it is a poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances."

■ Nor is it necessary to admissibility that the declarant should state in so many words that he is in extremis, that there is no hope of life, and that death is imminent. Just so the judicial mind is fairly convinced by legally sufficient evidence, after a careful consideration of all the circumstances, that at the time such declarations were made such was the conviction of the deceased. Illustrative is the expression of the declarant in Marshall v. State, 219 Ala. 83, 121 So. 72, 63 A.L.R. 560; "She has got me"; as well as other illustrations found cited in that authority. Likewise quite a number are noted in Shikles v. State, 31 Ala.App. 423, 18 So.2d 412, certiorari denied 245 Ala. 641, 18 So. 2d 417.

■ As observed in the Shikles case, supra, the admissibility of the declaration is not to be controlled by the length of the interval between the declaration and death, but by the declarant's state of mind and his conviction that death is imminent. This observation is applicable here in view of the fact that Addie Ruth Booth did not die until a few days after making this declaration, her death occurring at 1:30 a. m. Sunday, October 29th.

■ Considering the testimony of the resident physician that he had told this girl that she was in a serious condition and would probably die and her positive declaration that she was in a dying condition and had been so told, we are persuaded the court committed no error in admitting this declaration over defendant's objection.

■ Of course, the dying declaration of a decedent as evidence is subject to impeachment in the same manner and for the same causes for which the testimony of a witness given on the stand may be impeached. Marshall v. State, supra; 40 C. J.S., Homicide, § 305, p. 1285. The defendant sought to impeach the declarant, and offered some witnesses who testified to her bad character for truth and veracity, and that they would not believe her on oath.

There was offered in evidence a sweater with powder burns around a hole, presumably made by this bullet wound. The expert stated that this pistol, to have produced the powder burns, must have been as close as two feet, while in the dying declaration the declarant has stated that her father was standing some ten feet from her. There was also testimony indicating that she had not been in an automobile wreck, as the declaration states. But all of these matters were proper for the jury's consideration as to the weight to be given the declaration.

■ There were charges given for the defendant calling attention to the matter of contradiction and impeachment of the declarant. Defendant, however, insists that the court was in error in refusing Charge 22, which reads as follows:

"If you are reasonably satisfied from the evidence that the alleged dying declarations of Addie Ruth Booth are false, in any material portion of said declarations, then you may disregard said dying declarations entirely."

This charge is defective, however, in that the word "willfully" is omitted. To justify the jury in entirely disregarding the testimony of the witness, they must have found that the material portions of said declaration were willfully false. Such is the holding of our authorities. Prater v. State, 107 Ala. 26, 18 So. 238; Tindall v. Guy, 243 Ala. 535, 10 So.2d 862; and Keef v. State, 7 Ala.App. 15, 60 So. 963.

In Refused Charge 7 is the positive statement that defendant is presumed innocent as a matter of law and that this presumption of innocence is an evidentiary fact which remains with the defendant throughout the trial of the case. Though there is a contrariety of opinion among the authorities (22 C.J.S., Criminal Law, § 581, p. 896), yet our own decisions are to the effect that this presumption does not necessarily attend the defendant throughout the whole trial, but only until it is overturned by evidence which convinces the jury of guilt beyond a reasonable doubt. Waters v. State, 117 Ala. 108, 22 So. 490; McClain v. State, 182 Ala. 67, 62 So. 241; Osborn v. State, 30 Ala.App. 386, 6 So.2d 461. There was, therefore, no error in the refusal of Charge 7.

Undisputedly, the deceased met her death as the result of a pistol shot wound. The pistol was, of course, a deadly weapon. It is well understood the jury may infer malice from the use of a deadly weapon alone unless the evidence which proves the killing rebuts the presumption. As stated in Compton v. State, 110 Ala. 24, 20 So. 119, 122:

"When the facts which prove the killing do not rebut the presumption, which the law raises, the burden is on the defendant by other evidence to rebut it, and failing to meet this burden, the presumption of the law is against him."

Defendant reserved an exception to that portion of the oral charge of the court declining to instruct the jury on manslaughter in the first degree, and to the effect there was no evidence to rebut the presumption of malice. A brief reference to the tendency of the evidence, both on the part of the State and the defense, is necessary in this connection.

That for the State tended to show the defendant had often whipped and mistreated his daughter; that he talked to her in a most abusing manner, which is supported by a note left for her, which he admittedly signed, the language of which need not be here repeated; that on the morning of Wednesday, October 25th, about 12:30 a. m. Mrs. Suddeth, his near neighbor, from her porch which was, as she states, some 65 steps from defendant's house, heard the defendant say to his daughter: "You won't do anything I tell you to do; you were over at Kimberly with that sorry white trash, and I had rather see you dead and in your grave, you low down bitch; you ought to be dead and in Hell, and I'm a good mind to kill you." About the same time Mr. Suddeth heard the deceased crying and could hear the defendant as he whipped her. This whipping was admittedly with his belt, which he said he folded. No one testified to hearing a pistol shot.

Closely following defendant's arrest at the hospital Wednesday night, officers went to the home and took a picture of Addie Ruth's room, which disclosed the pistol hanging on a nail above the mantel. And the evidence of the State's expert, upon examination of the pistol, indicated the barrel had been cleaned, if in fact deceased had been shot with that pistol, as she stated in her dying declaration. There was in the pistol the cartridge, showing that it had been fired, and the bullet removed from the body corresponded with the .22 caliber cartridge.

Miss Carver, the supervisor at the emergency ward, testified the defendant told her his daughter stuck a stick in her chest, and he pulled out the stick. This, defendant denied, saying that he merely said that his daughter told him she had hurt herself when she fell over a stump or a stick.

The evidence further tended to show that the daughter was afraid of her father, at times spending the night with neighbors, and on one occasion was at a neighbor's home almost a week, going to school with the children there each day. But further details may be omitted.

The evidence for the defendant was to the effect that he came home Tuesday night as usual after 12 o'clock; that it was the custom of his daughter to unlock the door and let him in, but that on this occasion when he knocked on the door she informed him that the door was not locked, to come in; that he turned on the light and found her stretched on the bed. She complained that her stomach hurt her. He upbraided her about not going to school, and she finally admitted that she deserved to be whipped, and the whipping with the belt followed; and when she stood up he

discovered that she was trembling in her legs, and he got some alcohol and rubbed them, and for the first time noticed the place on her chest, which was not bleeding. It was then she told him she had fallen across a stump. He states that he put some salve on the place, some gauze over it, gave her some laxative, and went to bed.

It was his custom to sleep until 10 o'clock in the morning. The next morning he found her no better, and went to his neighbor, Mrs. Suddeth, to borrow some laxative. Before he left for his work at 12:30, however, he went over to his mother's and brought her to the house. He insists that he told them that unless she got better, they were to call a doctor. A local physician came late that afternoon, and from a cursory examination, advised that the deceased be sent to the hospital. Defendant came from his work at the terminal station with his neighbor and friend, Suddeth, intending to take Addie Ruth to the hospital in the car, but found that she was too sick and came with her in an ambulance which he had procured. He insists that any whippings he gave his daughter were on account of her staying away from school, as well as staying out at neighbors' at night on occasions. He did go to the principal of the school and request that he punish his daughter by keeping her in on account of any absence.

Defendant offered witnesses who testified to his good character, and good character as to peace and quiet, some of whom admitted on cross-examination they had heard of defendant's having served more than one sentence for larceny or burglary.

Defendant offered the testimony of one of the girl's schoolmates, who stated that the deceased made the statement to her that if her father didn't stop whipping her she would take poison and kill herself.

■ The dying declaration, which we have held was properly admitted in evidence in this case, was direct testimony and not circumstantial. 40 C.J.S., Homicide, § 304, p. 1285. And the foregoing brief review of the State's evidence is, of course, to be considered in connection with this dying declaration.

It appears, therefore, from this record that the defendant rested upon the theory that his daughter committed suicide.

■ When, under the undisputed evidence in the case, the defendant is guilty of either murder in the first or second degree or of no offense at all, there is no necessity for the court to charge the jury on the law of manslaughter in the first degree. Under such circumstances, a charge to that effect would have been abstract. Whitehead v. State, 206 Ala. 288, 90 So. 351; Gafford v. State, 125 Ala. 1, 28 So. 406; Kelly v. State, 235 Ala. 5, 176 So. 807.

■ We have briefly outlined the tendencies of the evidence, which we think clearly demonstrate that the charge of manslaughter was not involved under the evidence in this case. The case of Compton v. State, supra, upon which counsel for defendant relies, recognizes this rule, wherein it is stated that the court should also charge the jury in homicide cases upon manslaughter "unless there is an absence of all evidence having a tendency to reduce the offense to manslaughter." Here there was an absence of any such evidence. It was either murder in the first or second degree or the defendant was guilty of no offense at all. The court, therefore, committed no reversible error in declining to charge the jury upon the law relating to manslaughter.

In brief of counsel for the defendant attention is called to the fact that no one has testified to hearing a pistol shot, and that no one knows when the deceased was shot; that there is evidence tending to show that she did not do her chores about the house that afternoon as was her custom; that deceased repeatedly stated that she fell over a stump, and to some she stated she had been injured in an automobile wreck. Counsel then argue that whatever may be said against the defendant, and even if it be supposed he shot her, could it not be said it was done in a sudden rage of temper or in a scuffle over the gun and accidentally while he was taking it from her, or in many other ways which might be mentioned? And so considered the insistence is that, as a matter of law, the jury should have been instructed on manslaughter in the first degree.

■ As we view this argument, it is rested solely upon supposition and conjecture. This is not the basis, however, upon which the court is called upon to charge upon this degree of homicide. The presumption of malice arises from the use of a deadly weapon unless the evidence produced as to the killing rebuts that presumption. And the case is to be tried upon the

evidence produced and not upon mere conjecture. The difficulty with this argument is that it has no basis in fact, as developed upon this trial. Indeed, any such conjecture runs counter to defendant's contention upon the trial.

There was direct evidence, as we have indicated, and as disclosed by the dying declaration of the deceased, that the defendant fired the fatal shot. There was no evidence that any third person fired the shot. Refused Charge 10, which is rested upon the theory that the jury find from the evidence that the deceased came to her death by some method unknown to the jury, is abstract. It is otherwise objectionable as being argumentative and misleading, and places the burden on the State to disprove this unknown agency. The court was justified in refusing Charge 10.

As we have previously observed, the evidence in this case was not wholly circumstantial, the dying declaration being considered as direct testimony. Charge 5, requested by defendant, stating to the contrary was properly refused for this reason, if for none other.

Among the grounds of motion for a new trial was the one that the verdict was contrary to the great preponderance of the evidence. The motion was denied. The solution of the questions of fact presented in this case was one not free from difficulty, but was one peculiarly for the jury's determination. The trial appears to have been conducted with great care. The defendant was vigorously represented by able counsel who was alert to his every interest, and the trial judge likewise appeared to have conducted the trial in such a manner as to safeguard defendant's every right. Under the rule by which we are here guided, there is no justification for a disturbance of the trial court's action in denying the motion for a new trial based upon this ground.

We have considered the questions presented in oral argument and brief. But mindful of our duty in cases of this character we have also examined the record for any other error which would justify reversal of the cause. We have found no such error.

It results, therefore, that the judgment of conviction is due to be affirmed. It is so ordered.

Affirmed.

BROWN, LIVINGSTON, and SIMPSON, JJ., concur.