94 So.2d 202

Onnie **KISSIC**

v.

**STATE of Alabama.**

7 Div. 315.

Supreme Court of Alabama.

March 7, 1957.

Rehearing Denied April 4, 1957.

John Patterson, Atty. Gen., and Edmon L. Rinehart, Asst. Atty. Gen., for State.

Ralph Gaines Jr., Talladega, and Beddow, Gwin & Embry and Roderick Beddow, Jr., Birmingham, for appellant.

MERRILL, Justice.

Onnie Kissic was indicted and tried for the murder of Nile Collard. He was found guilty of murder in the second degree and sentenced to the penitentiary for thirty years and one day, and he appealed to this Court.

This cause must be remanded for another trial and, for that reason, only such facts will be stated as are required to explain the questions of law to which we address ourselves, and only those questions likely to arise in another trial are treated at length in this opinion.

The deceased, while in his own home, received knife wounds which proved fatal. William Curtis Harper was the person who did the cutting. He was tried a month prior to appellant and convicted. The judgment in his case was affirmed by this Court, Harper v. State, 264 Ala. 510, 88 So.2d 788. Appellant drove the automobile in which he and Harper were riding to the home of the deceased. It was the State's theory that appellant held the deceased while Harper cut him. Appellant's defense was that he was trying to help deceased by pulling Harper off the deceased.

■ The first question is concerned with a statement admitted into evidence as a dying declaration. Herman Ragsdale, a neighbor of deceased, drove him to the hospital immediately after the cutting. He testified that during the ride to the hospital he told Collard that he was not dying, but Collard's reply was "Yes, I am cut to death;" and later, as he nearly ran the car off the road at a high speed, the deceased said "Herman, I'm dying but don't wreck this car and kill me." Ragsdale testified that he then asked the deceased who cut him and Collard answered "Curtis Harper cut me and Onnie helped him." They arrived at the hospital between three and four o'clock in the afternoon, and Collard died a few hours later.

The two statements preceding the dying declaration were sufficient predicates. We have held that it is not necessary that deceased should have made a specific statement to the effect that he was conscious of impending death. It is only necessary that the circumstances and the statements made by deceased should warrant the inference that deceased felt that he was fatally wounded and would die. Gurley v. State, 216 Ala. 342, 113 So. 391; Gerald v. State, 128 Ala. 6, 29 So. 614; Shikles v. State, 31 Ala.App. 423, 18 So.2d 412, certiorari denied, 245 Ala. 641, 18 So.2d 417.

■ Appellant argues that the part of the dying declaration " * * * and Onnie helped him" was not a collective fact but an illegal and inadmissible conclusion. We cannot agree. In Smith v. State, 133 Ala. 73, 31 So. 942, 943, this Court held that when deceased, in a dying declaration, said one Batts shot him and also that "Bob Smith, was trying to shoot me at the same time," the statement concerning Smith was a statement of a collective fact and was admissible. See Marshall v. State, 219 Ala. 83, 121 So. 72, 63 A.L.R. 560.

■ Having held that the dying declaration was admissible, this disposes of appellant's contention that he was entitled to the general affirmative charge with hypothesis. The case was properly submitted to the jury. Crowell v. State, 233 Ala. 201, 171 So. 267; Booth v. State, 247 Ala. 600, 25 So.2d 427.

The trial court properly excluded the testimony of the purported dying declaration made to Officer Higgins and the questions raised as to the prejudicial effect of this testimony should not arise on another trial.

■ Prior to the close of the State's case in chief, the Solicitor made the following statement:

"Mr. Hollingsworth: May it please the Court, at this time the State re-

spectfully requests the Court to call Margie Collard or Margie Kissic as a witness in this case as the Court's witness and the State states the reasons for requesting the Court to do so as follows: That Margie Kissic or Margie Collard was present at the alleged homicide and it is undisputed that Margie Kissic is the sister of the defendant on trial and it is my information that, from the statement that was taken from her the night that the alleged homicide happened, that she made under oath and was taken down by the Official Court Reporter from the 29th Judicial Circuit and taking into consideration her testimony in open court on the trial of the Harper case, the State respectfully requests that she be called by the Court so that the State can have ample grounds and could have ample opportunity to cross examine the witness in case she didn't testify to what the State believes is the truth of the matter—."

Following objections, further statements by attorneys etc., the court made the following statement, to which appellant excepted:

"The Court: It is in the Court's discretion whether or not to do it. I feel that under the circumstances of she being the sister of the defendant that I am going to call her and that will give both of you the right to examine her fully on cross examination."

Practically the same procedure was followed when the court called Kenneth Collard, the nine year old son of deceased, as the court's witness. In each instance, the court first questioned the witness, then the state and the defendant cross examined them.

In Hunt v. State, 248 Ala. 217, 27 So.2d 186, 192, we said:

"It is recognized by good authority that the court in its sound discretion may introduce witnesses in a criminal case, though they are not offered by either the state or defendant, especially so as to expert witnesses, originally regarded as 'amici curiæ,' from the earliest period. 3 Chamberlayne on Evidence, section 2376, 2552–2570; State v. Horne, 171 N.C. 787, 88 S.E. 433; Morris v. State, 100 Fla. 850, 130 So. 582(9); Buchanan v. State, 95 Fla. 301, 116 So. 275; Hall v. State, 136 Fla. 644, 187 So. 392, 407(44, 45); 16 Corpus Juris 846, Note 69; 23 C.J.S., Criminal Law, § 1017; 70 Corpus Juris 566; § 723, Note 61 et seq.; Gomila v. United States, 5 Cir., 146 F. 2d 372; United States v. Guertler, 2 Cir., 147 F.2d 796."

In Anderson v. State, 35 Ala.App. 111, 44 So.2d 266, 272, the Court of Appeals said:

"It is within the sound discretion of a trial judge, in the interest of truth and justice, to call to the stand and examine, or permit to be examined by both parties, any witness who may be able to shed light upon the issues, the court being careful to preserve an attitude of impartiality. Hunt v. State, 248 Ala. 217, 27 So.2d 186; Gomila v. U. S., 5 Cir., 146 F.2d 372; Roth v. Moeller, 185 Cal. 415, 197 P. 62; State v. Horne, 171 N.C. 787, 88 S.E. 433; Pendleton v. Commonwealth, 131 Va. 676, 109 S.E. 201; Townsend v. City of Joplin, 139 Mo.App. 394, 123 S.W. 474; Merchants' Bank v. Goodfellow, 44 Utah 349, 140 P. 759."

While the Hunt case, supra, dealt with the calling by the court of an expert witness, some of the cases cited as authority cover a wider field. The Horne case, from North Carolina, deals with expert testimony, but the three Florida cases are in point in the instant case because in each instance, the prosecution requested the court to call the witness because it was reliably informed that the witnesses would repudiate former statements or testimony. The law in Florida seems settled, based upon these cases, that: "The presiding

judge has a right, in the exercise of a sound discretion, to call a witness either for or against the prisoner, and, when so called and questioned by the court, to permit both sides to cross examine him." The Gomila case, supra [146 F.2d 374], while stating that "in aid of truth and in furtherance of justice, the court may question a witness,—in fact, he may call and question a witness not used by either party,—but in so doing the court should be careful to preserve an attitude of impartiality and guard against giving the jury any impression that the court was of the opinion that defendant was guilty," actually turned on the conclusion that the trial court took too prominent a part in the examination of witnesses called by the parties. In the Guertler case, supra, the trial judge directed the district attorney to call a certain witness, and this was held not to be error. In Young v. United States, 5 Cir., 107 F.2d 490, the right of the trial court to call and examine a witness known to be hostile to the government was upheld.

The opinion in Anderson v. State, supra, cites, in addition to some cases already discussed, a criminal case from Virginia. The Pendleton case holds that the court's calling of a witness believed to be hostile to the commonwealth and permitting her cross examination was done in the exercise of a sound discretion, and did not constitute error.

In view of the holdings in Hunt v. State, supra, and Anderson v. State, supra, and some of the cases cited therein, we are constrained to hold that the trial court, in the exercise of its sound discretion, did not err in calling the ex-wife and son of the deceased as the court's witnesses and in permitting them to be cross examined by each side. It is unnecessary for us to pass on the questioning of these witnesses but we again caution that the court's action and questions should be such at all times to preserve the judicial attitude of strict impartiality.

The trial court committed reversible error in permitting an audograph record to be played in the presence of the jury. A few hours after Collard was cut, the solicitor questioned Collard's ex-wife in the presence of several witnesses, one of whom was the official court reporter. The questions and answers were recorded on an audograph record. At the trial, Mrs. Collard was called as the court's witness and, in her direct examination by the court, she put the blame for the killing on Harper and put her brother, appellant, in the role of helping her pull Harper off deceased. During her cross examination by the solicitor, she was asked if she remembered being put under oath and making a statement. She answered that she did not remember it. The solicitor asked that the record be played to refresh the witness' recollection. Over strenuous objections and exception of appellant, the court permitted the record to be played in the hearing of the jury.

The answers to the questions contained considerable illegal and irrelevant matter and highly prejudicial hearsay statements insofar as the appellant was concerned. When the record had been played, the court made the following statement to the jury:

"Gentlemen, I want to tell you now this statement that you have heard from this record is not testimony in this case. It was played in order to let this witness hear it. What was on the record is not to be considered by you as evidence. Now, let the record show that the record that was played was an audograph record and it was played with microphone equipment to amplify it and the voices that spoke were audible all over the courtroom."

This statement did not begin to eradicate the possible harmful effects of playing the record in the presence and hearing of the jury. If the purpose of playing the record was to let the witness hear it, that result could have been achieved out of the hearing and presence of the jury. It is obvious from reading the transcript that the state's purpose in having the record played was to have the jury hear it and to impeach the witness. There was no attempt to

follow the procedure suggested by the Court of Appeals in Wright v. State, Ala. App., 79 So.2d 66.[1] While we did not specifically approve this suggested procedure on petition for writ of certiorari, Wright v. State, 262 Ala. 420, 79 So.2d 74, neither did we disapprove of it.

It is evident that at least the solicitor and the trial court had transcriptions of the audograph record, and extracts from the transcription were later received in evidence for impeachment purposes. We are not to be understood to hold that this latter admission into evidence was erroneous. The error was in the playing of the record in the presence of the jury when it contained illegal hearsay evidence and prejudicial statements. To permit either the state or the defendant to play records previously made of complete conversations with witnesses under the pretext of refreshing their recollection, would open the door to putting evidence before the jury which could never be admitted under the established rules of evidence, and which, once in evidence, would be extremely prejudicial irrespective of any instructions the trial court might give in excluding it or trying to eradicate its effect.

The trial court also erred in making this statement after both sides had rested and just before the argument to the jury:

"The Court: According to the testimony everyone else that was in that room has testified except Mr. Harper and if either side of you want me to do it, I will call him as my witness because I want to get the whole thing in, if you want it. In other words, you all have investigated and whether you want him or not, I don't know. It doesn't matter to me, but if you want him I would be glad to call him as my witness. Now you don't have to say anything at all if you don't want to. If you do want him, make your motion. If you don't don't say anything if you don't want to."

This statement, to which appellant took exception, shows on its face that the trial court intended it to be applicable to both sides but such a statement should not, under any circumstances have been made in the presence of the jury. If the trial judge had felt that either side had inadvertently overlooked calling Harper as a witness, he could have called it to their attention or made the same offer which he did make *out of the hearing of the jury.* It is the settled law in this State that no unfavorable inference can be drawn, and no unfavorable argument to a jury made, by counsel against a party to a cause because of the failure to call a witness to testify, when that witness is accessible to both parties, and can be introduced by and examined by either party. Forman v. State, 190 Ala. 22, 67 So. 583; Jarrell v. State, 251 Ala. 50, 36 So.2d 336. It would seem that a comment by the trial judge from which such an inference could be drawn would also constitute reversible error.

The judgment of the lower court is reversed and the cause remanded.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.

On Application for Rehearing

MERRILL, Justice.

In his brief in support of the application for rehearing the Attorney General states: "A careful reading of the record in the instant case makes it extremely questionable that the defendant was prejudiced either by the playing of the audograph record or the judge's statement concerning the availability of Curtis Harper." The statement concerning the availability of Harper is set out in our opinion and we deem no additional comment to be necessary. But we do think it is proper, in view of petitioner's argument,

1.  38 Ala.App. 64.

to show that the record does disclose that the audograph record, which was played in the hearing of the jury, contained prejudicial matter. We quote one question and answer:

"Q. What did Mr. Kissic do, if anything?

"A. Well he was there, *Kenny said,* I couldn't see when Nile hollored for me right when he cut him and when he did I made the dive for him and one of them, Onnie I believe, I don't know which one, but when he run at him he knocked me back and I run again up there to get Nile, when I hit him with the coffee pot somebody knocked me back I don't know who done it, when I started to him and *Kenny said* that Onnie was holding him which he was down there right up under him, he had to be holding him." (Emphasis supplied.)

It is so obvious that this was hearsay that no comment is needed except to note that this was the only information the jury received from any witness that defendant was "holding" deceased.

█ The State also insists in brief that our opinion in the instant case is susceptible to a construction that no part of a recording can ever be played to refresh the recollection of a witness. We do not intend to so hold. As already stated in our original opinion, Mrs. Collard testified that she did not remember being put under oath and making a statement to the Solicitor and others. (This was the statement contained on the audograph record.) The recording was offered, played and received in evidence solely for the purpose of refreshing the witness' recollection. If that had been the sole purpose, the preliminary part of the record—the who, what, when, and where—could have been played; the witness could have heard her own voice enough to positively identify it, and at the same time no prejudice could possibly have resulted. We illustrate by transcribing the first three questions and answers from the record:

"Q. Is this Mrs. Margie Collard? A. Yes.

"Q. Would you raise your right hand, Mrs. Collard and let me swear you in, please. Do you solemnly swear to tell the truth, the whole truth and nothing but the truth, so help you God. A. I do.

"Q. We would like for the record to show that this statement is made in the Talladega County Courthouse in the courtroom at fifteen minutes till 9:00 o'clock on Tuesday night November 8, 1955 and present is Mrs. Ann McKinney, Court reporter, Mr. James Cooper, deputy sheriff, Mr. Buster Hogan, photographer, Mr. Bill Barber, deputy sheriff and John W. Robinson, Sheriff of Talladega County and myself, Circuit Solicitor and Mrs. Margie Collard. Now, Mrs. Collard I am going to ask you please ma'am just to tell me in short rendition form, just what happened from the time that you got up this morning, just start and tell what happened? A. Well, me and Nile Collard left early this morning and went to Childersburg for me to do the laundry while he taken Kenny to the doctor and we done that and come back home and hung the clothes out and we left and went straight from there coming to Talladega and we stayed up here waiting on Mr. Teel to see him about getting remarried and we didn't get to see him and it was about, the best that I know, about 2:00 o'clock when we left from here going back home. Well, we went home straight from here we went home and when we went through the back door at the house somebody had already been there because the water bucket was gone and the door was opened and Nile told me, he says 'Well I guess probably they have been up here,' he meant Onnie and Harper and so he says 'I am going on and change clothes, I have got to go to work, and I think I will just call and get off and

stay with you'. But he didn't, he went on in the bedroom and I don't know where that he changed clothes or not. Before he got—as he started back through the kitchen where I was they come up in the car and pulled right there at the door."

The playing of this much of the record would have been ample to refresh recollection, could not have been prejudicial to the defendant and would have been entirely proper. But the playing of the entire record before the jury, involving the first quoted excerpt, was error which was not eradicated by the court's instruction that the recording was not testimony and should not be considered as evidence.

The application for rehearing is overruled.

LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.