The Grand Jury of Etowah County returned an indictment against the appellant, Loretta Jean Bell, charging her with the first degree murder of Walter Lee Bell by stabbing him with a knife. Appellant entered a plea of not guilty. A jury found the appellant guilty of murder in the second degree, and fixed her punishment at imprisonment in the penitentiary for twenty years. The trial court entered a judgment in accordance with the verdict, and appellant appeals to this Court. *Page 2 
The appellant was represented at all proceedings in the trial court by counsel of her choice, and is represented in this Court by the same counsel appointed by the trial court. This appeal was submitted to this Court on briefs.
The appellant states in her brief three reasons why her conviction should be reversed. First, the trial court erred to her prejudice by denying her the right to file a motion for a new trial; second, by allowing a signed waiver of her fullMiranda rights, and a signed confession to be admitted in evidence; third, by allowing a dying declaration in evidence.
The stabbing of the deceased, who was the husband of the appellant, occurred about 3:00 A.M. on February 11, 1979 at the V.F.W. Club on East Mighan Boulevard in the City of Gadsden, in Etowah County, and he died at 5:46 P.M. the same day. State's witness, W.A. O'Bryant, a Lieutenant in the Detective Division of Gadsden Police Department, testified, in substance: That around dinner time on February 11, 1979 he went to the home of appellant's grandmother where the appellant came to the door. That at that time Officer O'Bryant did not know if Mr. Bell was deceased or not. That Officer O'Bryant stated to appellant his official capacity, identified himself to her, and asked if he could come in and talk with her; that she invited him to come in; that he informed her of her rights, and asked her if she understood them; that she stated that she did. He told her she was not under arrest at this time, but that she was a suspect in the investigation of an alleged stabbing. That he would like for her to come to police headquarters and give a statement as to what happened. That she voluntarily said she would. That after a short period of time she came to police headquarters. That Chief Carter of the Gadsden Police Department was in O'Bryant's office with him when the appellant arrived. That both O'Bryant and Chief Carter explained her rights to her, and she said she understood them, and she voluntarily signed a waiver. That the waiver contains the same rights he gave her at the home where he first saw her on the 11th day of February, 1979. The paper was then handed to the Court Reporter and marked state's exhibit number one for identification purposes. State's counsel made known to the court that he intended to introduce state's exhibit one in evidence. Whereupon, the appellant objected on the ground that the corpus delicti has not been proven. The court sustained the appellant's objection. Whereupon, the state then put on two witnesses who testified, in substance, that they were present at the V.F.W. Club, and saw the appellant stab the deceased. State then called Dr. B.J. Steinberg, whose qualifications were admitted by appellant, who testified that he was a general surgeon; that he examined the deceased in February of 1979; that he had a stab wound of the chest that perforated his lung. That his lung then collapsed, and he died within hours to a day. That his death was fast.
State's exhibit one was again offered in evidence. Appellant again objected on the ground that the corpus delicti has not been proven. The trial court overruled the appellant's objection, and allowed state's exhibit one to be place in evidence. State's exhibit one is in words and figures, as follows:
"WAIVER OF COUNSEL OF DEFENDANT IN CUSTODY
 "I, Loretta Jean Bell, have been informed by the undersigned law enforcement officers, prior to being questioned by them, that I am suspected of the offense of assault with intent to murder, in Etowah County, Alabama, on the 11th day of February, 1979, and have been informed by them of my rights as follows:
 "1. That I may remain silent and do not have to make any statement at all.
 "2. That any statement which I might make may be used against me in court.
 "3. That I have a right to consult with an attorney before making any statement and to have such attorney present with me while I am making a statement. *Page 3 
 "4. That if I do not have enough money to employ an attorney, I have the right to have one appointed by the court to represent me; to consult with him before making any statement; and to have him present with me while I am making a statement.
 "5. That if I request an attorney, no questions will be asked me until an attorney is present to represent me.
 "After having my rights explained to me, I freely and voluntarily waive my right to an attorney. I am willing to make a statement to the officers. I fully understand my rights to an attorney and I have (read — had read to me) this waiver of counsel and fully understand it. No threats or promises have been made to me to induce me to sign this waiver of counsel and to make a statement to the officers.
"This the 11th day of February, 1979. 12:10 PM.
"Loretta J. Bell
 "All of the rights in the above waiver of counsel were read and explained to the above defendant by me and he freely and voluntarily waived his right to an attorney. No threats, promises, tricks, or persuasion were employed by me or anyone in my presence to induce him to waive his rights to an attorney and to make a statement without an attorney. He freely and voluntarily signed the above waiver of counsel in my presence after having (read-had it read).
"Name Sgt. W.A. O'Bryant
 "Title Detective Division
"Gadsden Police Dept
"Witnessed By:
"Sgt. W.A. O'Bryant
"-------------------
"STATE'S EXHIBIT 1"
Officer O'Bryant was recalled by the state, and testified, in substance, the following: That appellant made a written statement to him later that afternoon. Whereupon, the appellant objected to any evidence about the written statement on the ground that the corpus delicti had not been proven. Whereupon, the court inquired of appellant's counsel, as follows: "Do you want to go outside the presence of the jury?" to which appellant's counsel answered: "I object to it on the grounds that the corpus delicti has not yet been proven to this jury; that the man died, yes, but the cause of death, no. It is out of order at this point and the procedure is not proper. We object to it." The court replied, "Subject to being connected up, I will let it in. Overruled." State's counsel proceeded with his examination of Officer O'Bryant, and he further testified, in substance, as follows: That he has a written statement which appellant signed. That he typed it as she told it, and she read it, and signed it after her rights were explained to her. That no threats or promises or coercion was made to her to make her sign it. That the statement was given voluntarily. That he has the statement with him.
Whereupon, the statement was marked for identification as state's exhibit number two by the Court Reporter, and was offered and received in evidence, and is in words and figures, as follows:
"STATE'S EXHIBIT 2
"Date February 11, 1979
"Page No. One
 "STATEMENT OF: Loretta Jean Bell B/F 23 520 Pioneer St. East Gadsden Ala. 492-5956
 "I am making this statement in regards to the stabbing of my husband Walter Lee Bell on the morning of 2-11-79. I am making this statement after having my rights explained to me. Walter I are separated and have been for some time. I am presently living with my grandmother and Walter is living with his mother. At approx. 10:00 P.M. I left my house walking and was going to the V F W Club on East Meighan Blvd. A neighbor picked me up and I rode to the Club with him. His name is Rickey Hardy. I got to the Club and went inside. I had been there for approx. 2 hours when I saw Walter and another Dude come in together. Walter never saw me and he *Page 4 
went to the Bar. He stayed at the Bar for several minutes and then he came thru walking toward the stage where the Disk Jockey is at. He saw a friend of mine, Geraldine St. George and stopped and talked to her. Walter then saw me and came over to where I was at. I got up and went to the Rest room and when I returned from the restroom, Walter was setting in my chair. He started cursing me and began calling me names such as Bitches Whores. I did not pay any attention to him. Walter then left the table and went to the dance floor and danced. He stayed away from where I was setting until the Club was ready to close. The Club closes at 3:00 A.M. The Club turned all the lights on and everyone was standing around talking. I walked over near the door and was setting on the edge of a table when Walter came to where I was at. He began to curse me and call me names again. He also shoved me and pushed me. He also swung at me but I dodged the blows and he never struck me. I finally got enough of his doings so I reached down in my blouse inside my Bra and brought out the black handle knife. It is a locked blade and the blade was open. When I went in the club the knife was in my purse. I took it out and opened the knife and placed it inside my Bra. When I reached in my bra and got the open Knife I turned and swung at Walter. The knife stuck in his back. He ran out the door and the knife was still in his back. Walter ran out the door and I did not see him anymore. I then went to the phone and called my Uncle, Lester Pearson. He came and got me and carried me home to my Grandmothers house. I then called the Police and told them what had happened. I gave them
"Loretta J. Bell
"Witness Sgt. W.A. O'Bryant
"Asst Chief N.L. Carter
"Date 2-11-79 Page No. 2
 "STATEMENT OF: Loretta Jean Bell (Cont. from page # 1)
 "all the information on Walter Lee as best as I could. I also told the Police that I wanted to turn myself in. They said that they would send a car but one never came. I stayed up until after 6:00 A.M. waiting and when the Police never came I layed down. This was all I knew about the stabbing until Sgt. O'Bryant came to my house. He explained my rights to me and then I had my cousin to drive me to Police Headquarters. This statement is true and correct to the best of my knowledge.
"Witness Sgt. W.A. O'Bryant
"Asst. Chief N.L. Carter
Loretta J. Bell"
Later during the trial the state called Dr. Henry D. Santina, who, after stating his qualifications as a doctor and pathologist, testified, in substance, the following: That he is under contract with Alabama Department Of Forensic Sciences to perform forensic autopsies for the State. That on February 13, 1979 he examined the body of the deceased, Walter Bell, who died in February, 1979. That he found two wounds in the left shoulder area. The wound in the front was an inch and a half wide, and the wound in the back was an inch wide. The depth of the wounds were through the entire shoulder, and they met. That the cause of death was a massive hemorrhage from a large vein that crossed beneath the collar bone. That it is called subclavian, sub meaning under the clavian from the clavical, which is the collar bone. The vein was cut about one-half of inferior aspect, and there were about two quarts of blood in the space over here, and there was some of this lighter material of blood. There was a tremendous amount of blood in the left lung area, about two quarts — about a quart and a half. That the effect of that much blood would be that he would be unconscious, and probably dying, and, yes, this blood in that chest cavity would prevent the lung from expanding, and he would have difficulty breathing, but he would have more difficulty from the loss of blood, and would be dying, or would be already dead.
State's witness, Helen A. Green, testified, in substance, that she was the mother of *Page 5 
the deceased. That she saw him at the hospital before his death. That she talked with him about his condition. Whereupon, state's counsel asked the witness: "What did he say?" The appellant's objection to the question was overruled, and then Mrs. Green's answer was: "He told me he was dying."
State's witness, Shirley Turner, testified, in substance, the following: That she is a sister of the deceased. That she saw and talked to the deceased while he was in the hospital about his condition. Whereupon, state's counsel asked: "What did he say to you about his condition?" Whereupon, appellant's counsel said: "On that predicate I certainly object to it, if it please the court." The court overruled the objection, and the witness answered. "He told me he was hot, and that he was burning, and that he was going to die."
Officer O'Bryant was recalled, and testified, as follows:
 "LIEUTENANT W.A. O'BRYANT, (recalled) at this time and testified as follows:
"FURTHER DIRECT EXAMINATION
"BY DEPUTY DISTRICT ATTORNEY MOORE:
 "Q. Lieutenant, you are still under oath, sir. I want to ask you again did you have occasion to talk with Mr. Walter Bell shortly before his death?
"A. Yes, sir.
"Q. And did he make a statement to you, sir?
 "MR. WRIGHT: I object to it, if it please the Court.
"THE COURT: Overrule.
 "A. He made a statement to myself and Chief Carter, which the interview was recorded on a mini tape recorder.
 "Q. Can you tell us what he said? Have you got any written statement about it?
 "MR. WRIGHT: We object to it, if it please the Court. I would like to ask this witness on voir dire two questions.
"THE COURT: All right.
"VOIR DIRE EXAMINATION
"BY MR. WRIGHT:
 "Q. Now, Lieutenant, prior to this under oath I believe you testified that we didn't advise him as to his condition or as to what a dying declaration is. Now, that's true?
"A. I didn't. I did not.
 "Q. All right, and further: Carter — referring to now Chief Carter who was with you — Carter said it was not a dying declaration as we left the hospital because I just cannot tell a man that he is dying. That's true, isn't it?
"A. Yes, sir.
"MR. WRIGHT: All right sir.
 "DEPUTY DISTRICT ATTORNEY MOORE CONTINUING WITH DIRECT EXAMINATION:
 "Q. But according to Mr. Wright's statement there Chief Carter did think Mr. Bell was dying?
"A. Yes.
 "MR. WRIGHT: I object to what somebody else thought.
"THE COURT: Yes, I sustain.
 "DEPUTY DISTRICT ATTORNEY MOORE: Your Honor, he brought it up.
 "THE COURT: Well, I sustain what he thought Chief Carter was thinking.
"Q. Do you have notes taken of that interview, sir?
"A. Yes, sir.
"Q. Would you tell us what he said, please?
"MR. WRIGHT: I object to it.
"THE COURT: Overrule.
"MR. WRIGHT: We except.
"A. Can I explain these notes, Mr. Moore?
"MR. WRIGHT: No sir. We object to that.
"THE COURT: Just answer the question.
"A. It was a question and answer.
 "MR. WRIGHT: Your Honor, we would like a standing objection to each — *Page 6 
 "THE COURT: — All right, you have it, Mr. Wright.
"Q. Okay. Tell us what he said.
 "A. Chief Carter asked the question: `Walter, can you answer a few questions? Can you tell us a little bit about what happened?' Bell: `Stabbed in the back.' Chief Carter: `Who stabbed you?' Bell: `My wife.' Chief Carter: `What is her name?' Bell: `Loretta.' Chief Carter: `Is it Loretta Jean Bell?' Bell: `Yes.' Chief Carter: `Where did this occur?' Bell: `At the VFW near Glencoe.' Chief Carter: `Can you tell us what happened? Was this last night or early this morning? About what time was it?' Bell: `Late.' Chief Carter: `This is the 11th of February, late last night after midnight. Can you tell us what happened?' Bell: `I was going out the door. She pushed me and threw a knife in my face. I tried to get it and said ain't no use in fighting. So I walked out the door and I felt something hit me in the back and I folded up. So I pulled it out of my shoulder. I thought it was in my neck so I ran.' Chief Carter; `What did you do with the knife then, Walter?' Bell: `The police got it.'
 "Q. That's enough, I think. You made notes of this conversation?
"A. No, sir, no notes. It was on a tape recorder.
"Q. Okay. Do you have a copy of that, what he said?
 "A. No, sir, that is the one I had in the file. There is no other copies.
"Q. That one right there?
 "DEPUTY DISTRICT ATTORNEY MOORE: Your Honor, we would offer that in its entirety as to what Walter Bell said.
 "MR. WRIGHT? I object, to it, if it please the Court.
"THE COURT: I sustain.
"DEPUTY DISTRICT ATTORNEY MOORE: Your witness.
"CROSS-EXAMINATION
"BY MR. WRIGHT:
 "Q. At the time that statement was made neither you or Chief Carter advised him as to a dying declaration as to what it was or what it consisted of or anything else? You just took a statement from the man, right?
"A. I believe I —
 "We told him that we wanted to talk to him. As I stated a while ago, Mr. Wright, no, I did not tell him it was a dying declaration.
"Q. And as a matter of fact —
 "A. — Neither did Chief Carter, to the best of my knowledge.
 "Q. And as a matter of fact when you left the hospital Chief Carter made the statement to you that it was not a dying declaration because I just can't tell a man he is dying?
 "A. I don't know whether it was those exact words, but it was something —
"Q. — In substance that is what he meant?
 "A. That he just couldn't tell a man he was dying, yes, sir.
 "MR. WRIGHT: If it please the Court, we move to exclude any and all evidence relating to this statement made by the deceased.
"THE COURT: Overrule.
 "MR. WRIGHT: We except. Are you through with this witness?
"DEPUTY DISTRICT ATTORNEY MOORE: Yes, sir.
 "MR. WRIGHT: Subject to recalling him tomorrow maybe.'"
The appellant did not deny the stabbing of the deceased. She claimed it was in self-defense. She testified that she went to police headquarters and told Officer O'Bryant what happened, and he wrote it down as she told it to him. She and two other witnesses testified to sufficient facts to present the issue of self-defense to the jury.
The jury returned a verdict finding appellant guilty of murder in the second degree, and fixed her punishment at twenty years in the penitentiary. The court duly sentenced the appellant to twenty years *Page 7 
imprisonment in the penitentiary in accordance with the verdict. The appellant then requested the court to furnish her a free transcript, and counsel. This request was refused by the court until such time as the appellant gave notice of appeal. Whereupon, appellant gave notice of appeal, and the trial judge determined she was a pauper, and ordered a free transcript, and appointed counsel to represent her on appeal.
The first error complained of by appellant is that the trial court, after having duly sentenced her, denied her the right to file a motion for a new trial because she was a pauper, and was entitled to a free transcript, and a court-appointed counsel. The trial court refused to order a free transcript, and to appoint counsel to represent her until after she gave notice of appeal as required by law. The appellant being a pauper, and being convicted, and sentenced to the penitentiary, was entitled to a free transcript, and a court-appointed counsel to represent her on appeal, but was not entitled to such relief until after she gave notice of appeal within the time provided by law, 42 days. When an appeal is taken from a judgment in the Circuit Court in a criminal case, the trial court retains jurisdiction for the purpose of granting a motion for a new trial. We hold that the trial court did not err to the prejudice of appellant when it refused to order a free transcript, and to appoint counsel to represent the appellant on appeal until after she gave notice of appeal as is required by law. Appellant was free to file a motion for a new trial as provided by law. Code Of Alabama, 1975, Sec. 12-22-133. The Court notes that the holding in this case on this question is confined to the facts of this case.
The second error complained of in appellant's brief is that the trial court allowed in evidence, over a timely objection of, and a motion to exclude from the evidence by the appellant, state's exhibit one, a written waiver of her full Miranda
rights signed by the appellant, and state's exhibit two, a written confession signed by the appellant. At the trial the grounds assigned by appellant to the introduction of state's exhibits one and two were that the corpus delicti had not been proven.
Without conceding merit to appellant's second error claiming that the state had failed to make proof of the corpus delicti before the introduction of appellant's signed confession, we hold that any alleged error for failure to prove the corpus delicti was cured by later proof of the corpus delicti, which made the confession admissible. Laffitte v. State, Ala.Cr.App.,370 So.2d 1108; Certiorari Denied, Ala., 370 So.2d 1111; Cooleyv. State, 233 Ala. 407, 171 So. 725; Long v. State, 39 Ala. App. 372, 105 So.2d 136, 268 Ala. 1, 105 So.2d 144; CertiorariDenied, 268 Ala. 692, 105 So.2d 145.
The appellant claims as reversible error that the fact that state's exhibit one, the written Miranda rights signed by the appellant, was erroneously allowed in evidence because appellant was not specifically advised that she was a suspect of the offense of murder in the first degree for which she was indicted. That she was advised by the officer that she was a suspect for an assault with intent to murder. The evidence before the trial judge sustains his decision that state's exhibit one contains the necessary Miranda warnings; that they were explained to the appellant; that she freely, and voluntarily, signed the waiver. In addition, appellant testified in her own behalf and freely admitted that she told Officer O'Bryant what had happened, and he wrote it down as she said it, and that she signed state's exhibit one and two. The appellant did not deny the stabbing of the deceased. She relied on the defense of self-defense.
It was the duty of the trial court to determine that the appellant was not threatened, or coerced in any manner, or promised any reward, or hope thereof, or offered an inducement, to get her to sign the waiver of her Miranda rights, and the confession. The trial court determined that her signatures to exhibits one and two were voluntarily, knowingly, and understandingly, made. This Court has no right to disturb the finding of the trial judge where there is evidence in the record to sustain it. *Page 8 
We hold that the trial court did not err in allowing in evidence state's exhibit one and two. Hall v. State, Ala.Cr.App., 365 So.2d 1249; Certiorari Denied, Ala.,365 So.2d 1253; Clark v. State, 56 Ala. App. 67, 318 So.2d 813; Myhand v.State, 259 Ala. 415, 66 So.2d 544.
The appellant's third contention made in her brief is that a dying declaration made by the deceased was admitted in evidence without a proper predicate being laid. It is the duty of the trial judge to determine if the declarant of a dying declaration was in extremis at the time the declaration was made, and if made under a sense of impending death as a result of his wound, and if it is not otherwise objectionable, it should be admitted. In law the sanction of an oath is present. Each case must be considered by the trial judge on its merits. In determining if a declaration should be allowed in evidence, the trial judge should consider statements of the deceased, the nature and gravity of his wounds, his physical condition, the length of time between the infliction of the wound and death, the cause of death, and all other facts tending to prove the state of mind of the deceased at the time the declaration was made. This Court should not disturb the finding of the trial judge if there was sufficient evidence to sustain it. The appellant contended at the trial that it was necessary that Officer O'Bryant and Officer Carter inform the deceased that he was dying at the time, or immediately before he made the declaration to them, for it to be a dying declaration. This is not correct. The deceased had earlier in the day stated to his mother and sister that he was going to die. It was necessary that at the time he made the declaration to O'Bryant and Carter that he believed he was going to die as a result of his wound. We hold that there was sufficient evidence before the trial judge to sustain his ruling. Ragland v. State, 238 Ala. 587,192 So. 498; Sidney v. State, 265 Ala. 136, 89 So.2d 745;Kissic v. State, 266 Ala. 71, 94 So.2d 202, 67 A.L.R.2d 530;Young v. State, Ala.Cr.App., 363 So.2d 1007; Thomas v. State,31 Ala. App. 1, 9 So.2d 150.
We have searched the record and are of the opinion that reversible error does not appear. The judgment of the trial court is due to be and is hereby affirmed.
The foregoing opinion was prepared by Honorable JOSEPH J. MULLINS, a retired Circuit Judge, serving as a Judge of this Court; his opinion is hereby adopted as that of the Court.
The judgment below is hereby affirmed.
AFFIRMED.
All the Judges concur. *Page 363